E-FILED
Friday, 09 November, 2018  12:29:58 PM
Clerk, U.S. District Court, ILCD

FILED
NOV - 9 2018
CLERK OF COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

# United States District Court
## Central District Of Illinois
### Peoria Division

United States Of America,
            Plaintiff,

vs.                                    No. 18-10046

Terrill Rickmon Sr.
      Defendant.


## Motion To Suppress Evidence

Now comes the Defendant, Terrill Rickmon Sr. Pro se, and pursuant to The Fourth Amendment of The United States Constitution (U.S.C.A. Amend. 4.), Brendlin v. California, 551 U.S. 249 (2007), Florida v. J.L., 529 U.S. 266 (2000), Elkins v. United States, 364 U.S. 206 (1960), Mapp v. Ohio, 367 U.S. 643 (1961), Delaware v. Prouse, 440 U.S. 648 (1979), United States v. Brignoni-Ponce, 422 U.S. 873 (1975), Wong Sun v. United States, 371 U.S. 471 (1963), Brown v. Texas, 443 U.S. 47 (1979), and the principles of Terry v. Ohio, 392 U.S. 1 (1968), moves this Court for an Entry of an Order To Suppress The Evidence in this particular case that was unlawfully obtained due to the Defendant being unlawfully seized, in violation of his Constitutional Rights, and in support of, states the following:

1) That a shot spotter is an acoustic sensor (microphone) that merely captures audio snippets associated with boom and bang sounds that may represent a gunshot. It was designed to be an investigative tool for the police, to alert them to possible gunfire and allow them to respond to see if there are civilian witnesses or other evidence of gunfire.

2) That a shot spotter does not have any optical capability and cannot produce video or images of any kind.

3) That a shot spotter cannot predict future criminal activity or claim an eye witness basis of knowledge.

4) That shot spotter is equivalent to a "bare-bones anonymous tip".

5) That there was no 9-1-1 emergency call placed by a civilian claiming to have either witnessed or been a victim of a shooting in the said area. (see pg. 12-13)

6) That Special Agent Kevin Brown (Affiant) attempted to bolster the criminal complaint by exaggerating and fabricating additional reports of shot spotter alerts that were never recieved nor broadcasted by dispatch personel to officers on duty on July, 29ᵗʰ 2018, before or during the stop and/or investigation. (See criminal complaint and dispatch report. Also listen to track #2 on dispatch audio disc.)

7) That a shot spotter only alerted the Peoria Police Dept. to a total of 4 sounds that could possibly represent gunshots, detecting a possible 2 shots in the rear of the residence of 2203 N. Ellis St., immediately followed by another possible 2 shots occurring approximately 6 seconds apart at 4:40 am. (see police report, dispatch report, and track #2 on dispatch audio disc (confirming a total of 4 possible gunshots.))

8) That in responding to dispatch Officer T. Ellefritz was the first to arrive in the said area at 4:48 am, approximately 8 minutes after the possible gunshots had been detected. (see Off. T. Ellefritz Police Report.)

9) That the shot spotter only identified a possible area / proximity, not the motor vehicle the defendant was traveling in.

10) That Officer T. Ellefritz initiated the unlawful traffic stop after spotting the vehicle in motion, which he then executed a road-block type stop, using his patrole vehicle to block/cut off the road and pathway of the vehicle that the Defendant was an occupant of at that time, then exited his patrole vehicle with his service weapon drawn, demanding that the driver shift the vehicle into Park, and then ordering the Defendant, at gun point to exit the vehicle. (see Off. T. Ellefritz Police Report and Patrole Vehicle Dash Camera Recording.)

11) That an individual's mere presence in an area of suspected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is or has committed a crime.

12) That inferring criminal activity from such evidence reflects no more than an "inchoate and unparticularized suspicion or hunch".

13) That Officer T. Ellefritz conducted the traffic stop "prior" to confirming that an actual crime had in fact occurred or corroborating the information that he had been informed of by dispatch to verify that the shot spotter alert was for actual gunfire and not attributed to indistinguishable sounds such as fireworks, car backfires, etc., which the system often reports as being gunshots.

14) That in 2015, Assistant Chief Mike Eddlemon stated that the Peoria Police Department did not calculate or keep track of how many shot spotter alerts ended up as false positives, whether alerts were unsubstantiated or proved to be false, or instances in which gunshots within their device's range weren't detected since they were installed in November of 2013. He also stated that the unconfirmed alerts are unavoidable. (see attached Journal Star report by Matt Buedel)

15) That shot spotter has been proven not to be accurate or reliable. Some cities including but not limited to Charlotte, N.C, Detroit, M.I., Suffolk County, N.Y., and Fall Rivers, M.A., have abandoned the system, deciding that the false-positive alerts were too problematic. (See attatched news articles.)

16) That temporary detention of individuals during the stop of an automobile by the police even if only for a brief period and for a limited purpose, constitutes a "seizure" of persons within the meaning of The Fourth Amendment.

17) That the Defendant was officially "seized" when the traffic stop was initiated.

18) That prior to initiating the traffic stop, Officer T. Ellefritz had not been apprised of any specific and articulate facts, and neither had he recieved any incriminating information that described or identified any of the occupants on a white 1992 Oldsmobile Tornado as having been involved in or associated with the discharge of a firearm.

19) That prior to initiating the traffic stop Officer T. Ellefritz had not observed the Defendant or any other occupant of the vehicle engaging in any unusual, suspicious, or criminal activity.

20) That prior to initiating the traffic stop Officer T. Ellefritz had not observed the vehicle being in violation of any of The State Of Illinois Traffic Laws or Equipment violations.

21) That prior to initiating the traffic stop, the occupants movement in the vehicle had no mark of fleeing men or men acting furtively.

22) That based upon Officer T. Ellefritz's personal Knowledge of the facts, he lacked probable cause and reasonable suspicion to justify the the stop.

23) That the demand for specificity in the information upon which police action is predicated is the central teaching of the Court's Fourth Amendment jurisprudence.

24) That to approve random patrol stops of all vehicles leaving from, coming to, or passing by an area where a shot spotter detects "possible" gunshots without an evidentiary basis for suspecting that a particular person or vehicle was involved or responsible, would subject all the residence of these and other areas to potentially unlimited interferrences solely at the descretion of patrol officers.

25) That it would be intolerable and unreasonable if police officers were authorized to stop every automobile on the chance of discovering evidence of criminal activity, and thus subject all persons lawfully using the city streets to the inconvenience and indignity of such a seizure. Travelers shall not be stopped at an officers whim, caprice, or mere suspicion.

26) That a seizure on mere suspicion collides violently with the basic human right of liberty.

27) That under The Fourth Amendment, all travelers in motor vehicles have a right to free passage without arbitrary interruption or interferrence by police officers.

28) That the occupants were entitled to the protection of The Fourth Amendment being passengers in a automobile as it traveled down North Ellis St. in a residential neighborhood, which in itself is purely innocent.

29) That the traffic stop was a lawless invasion/intrusion of the Defendants constitutional rights, in which the constitution forbids unreasonable searches and seizures.

30) That intrusions upon constitutional guaranteed rights must be based on more than inarticulate "hunches", and good faith on the part of the officers is not enough.

31) That it cannot be said that the officer was acting in good faith due to the fact that he was not relying on a warrant and neither was he upholding or enforcing a particular statue when he executed the traffic stop.

32) That reguardless of what the officer's subjective intent was in making the traffic stop, "legal justification for the stop must be objectively grounded". There was no lawful basis for concluding that either occupant had violated the law.

33) That a shot spotter does not, entirely by itself, create suspicion adequate to support a stop. There must be something atleast in the activities of the person/vehicle being observed that affirmitively suggest particular criminal activity completed, current, or intended.

34) That the officer embarked upon his expedition in hope that something might turn up.

35) That the evidence to which the instant objection is made has been obtained by exploitation of the illegal seizure

36) That the United States Supreme Court has stated that "what transpires at or after the time a vehicle is stopped is very irrelevant to the issue, and that an arrest or seizure is not justified by what a subsequent search discloses."

37) That there was no "break in the chain of illegality", therefore the subsequent consent was tainted and invalid as a matter of law.

38) That when there is a close casual connection between the illegal seizure and consent to search, not only is the exclusion of evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the Courts.

39) That Officer T. Ellefritz' conduct was overbearing and harrassing, and trenches upon the Defendants' personal security without a particularized objective evidentiary justification in which the constitution requires.

40) That Officer T. Ellefritz actions were excessive, in which he recklessly and with gross negligence violated the Defendants Fourth Amendments Rights.

41) That the rule excluding illegally seized evidence shall obviously apply in this particular case, and Officer T. Ellefritz' conduct is to be condemned as a deterrent to discourage future lawless conduct.

42) That it shall not be concluded that as little foundation as there is in this particular case can justify a seizure.

43) That the seizure of the Defendant is unjustifiable, lawless, invalid, unreasonable, and unconstitutional.

Wherefore, the Defendant humbly and respectfully request that this Honorable Court finds that there's an undisputable absence of any factual or objective basis that could possibly satisfy the reasonable suspicion standard, and that the said traffic stop, being the initial seizure, was a clear violation of the Defendants constitutional rights according to The Fourth Amendment of The United States Constitution. And as a result, the fruits of the subsequent search, which were obtained by exploitation of the illegal seizure, is to be deemed inadmissable against the Defendant and excluded from trial in the present case.

Respectfully Submitted,

By: Terrell A. Rickmon Sr.
Defendant.
Terrill A. Rickmon Sr.
301 N. Maxwell Rd.
Peoria, IL. 61604

I hereby certify that on November, 7th, 2018, I mailed the foregoing to the Clerk of the Court, U.S. District Court, IYCD, 100 N.E. Monroe, Peoria, IL., 61602, using the United States Postal Service, to be filed, as well as copies that are to be forwarded to the following: Assistant United States Attorney Ron Hanna, U.S. Attorney's Office, One Technology Plaza, Suite 400, Peoria, IL. 61602; Attorney For The Defendant, Federal Public Defender's Office, 401 Main St., Suite 1500, Peoria, IL. 61602.

Defendant,
By: Terrill A. Rickmon Sr.
Terrill A. Rickmon Sr.
301 N. Maxwell Rd.
Peoria, IL. 61604

**Robert Alvarado**

| | |
|---|---|
| **From:** | Phillip Geier |
| **Sent:** | Tuesday, September 25, 2018 7:00 AM |
| **To:** | Robert Alvarado |
| **Subject:** | FW: Subpoena for Rickmon |

**From:** Martha Hammer <mhammer@peoriagov.org>
**Sent:** Monday, September 24, 2018 5:13 PM
**To:** Phillip Geier <Phillip_Geier@fd.org>
**Cc:** Elizabeth Emert <eemert@peoriagov.org>
**Subject:** RE: Subpoena for Rickmon

There was no "911" call for service.  The officer responded to a ShotSpotter alert.

The ShotSpotter alert goes directly to the computers in the squad cars, as well as to dispatch.

Martha Hammer

*Martha J. Hammer*
*Records Administrator*
*Peoria Police Department*
*600 S.W. Adams St.*
*Peoria, IL  61602*
*(309) 494-8346*

**From:** Phillip Geier [mailto:Phillip_Geier@fd.org]
**Sent:** Monday, September 24, 2018 12:31 PM
**To:** Martha Hammer <mhammer@peoriagov.org>
**Subject:** RE: Subpoena for Rickmon

Martha:

There were no 911 calls on the dispatch tapes (CD) provided.  It may be that the incident does not have any 911 calls to the police dept. since it was initiated by shot spotter reports.  We just need to inquire to satisfy our due diligence requirements.

Thanks.

Phil Geier

**From:** Martha Hammer <mhammer@peoriagov.org>
**Sent:** Monday, September 24, 2018 12:19 PM
**To:** Phillip Geier <Phillip_Geier@fd.org>
**Cc:** Elizabeth Emert <eemert@peoriagov.org>
**Subject:** Subpoena for Rickmon

1

Phil:

We received the same subpoena on Terrill Rickmon on September 10th. We responded to that subpoena on September 11, 2018.

This audio record should be included in the first subpoena response, as it included the same times for calls for service.

What additional records are you seeking in the second subpoena?

Please contact me if you have questions.

Martha Hammer

*Martha J. Hammer*
*Records Administrator*
*Peoria Police Department*
*600 S.W. Adams St.*
*Peoria, IL 61602*
*(309) 494-8346*

 **JournalStar**

# Peoria Police hear benefits of ShotSpotter system, double coverage area

**By Matt Buedel of the Journal Star**
Posted Feb 28, 2015 at 4:30 PM
Updated Feb 28, 2015 at 4:41 PM

PEORIA — The system alerted to one shot fired at 2:58 a.m. Dec. 27 in a courtyard between buildings in the Harrison Homes. At almost the exact same time, a woman called 911 claiming she had been shot at by a female in a maroon Chevy Impala wearing red pants.

Peoria police stopped the suspect vehicle four minutes later about a mile away at Western Avenue and Southwest Adams Street. Officers seized a handgun and arrested a 21-year-old woman on charges of aggravated discharge of a firearm and possessing a small amount of marijuana and drug paraphernalia.

The case represented a best-case scenario for how the ShotSpotter gunshot detection system has worked in the 3-square-mile area of mostly South Peoria where it has been active since November 2013. It also marked the 35th gun seized in conjunction with a ShotSpotter alert from the time the technology came online through the end of 2014, according to records provided by police.

"It's been embraced by the officers," Assistant Chief Mike Eddlemon said as the department prepares to expand ShotSpotter coverage into the North Valley, East Bluff and Central Peoria. "I definitely think it's made us more efficient."

## TOP STORIES

1:18-cr-10046-JES-JEH   #30   Page 15 of 29

The ShotSpotter system, developed and maintained by a California company on a subscription basis, premises a near instantaneous notification

**News**

Peoria police say finding Alexis Scott remains a high priority

**News**

Baby found alone and lying in vomit on doorstep in Mapleton

**News**

Danny Dahlquist's story opens a tough ...

of gunfire for police through a combination of high-tech communication technology and decades-old theory for locating the source of sounds through audio triangulation.

The city of Peoria entered a $405,000 contract with ShotSpotter in 2013 for three years of service covering 3-square-miles of South Peoria and part of the West Bluff. This month, the City Council approved the agreement to double the coverage area at a cost of $459,000 over the next three years. Police hope to have equipment for the new area installed in the next three months.

The expansion in Peoria reflects ShotSpotter's growth in other markets. By the end of 2014, ShotSpotter systems had been installed in 90 cities and covered more than 300 square miles, according to information provided by the company.

The gunplay two days after Christmas in the Harrison Homes featured hallmarks of a shots fired call that make it more likely for officers to confirm whether someone pulled a trigger.

In instances when a citizen has called 911 along with a ShotSpotter alert, officers have located evidence of gunfire in 71.4 percent of cases. Without a ShotSpotter notification, police confirm citizen complaints of gunfire in only 8.9 percent of cases.

Less clear in Peoria is the frequency of ShotSpotter false positives — alerts for sounds that aren't gunfire or can't be confirmed — and false negatives — instances in which gunshots within ShotSpotter's range are not detected.

Figures presented to the City Council ahead of the expansion vote indicated police fielded 274 ShotSpotter alerts through the end of 2014 that were not accompanied by citizen complaints and could not be attributed to other sounds

like fireworks or cars backfiring. But Eddlemon said the department did not calculate how many ShotSpotter alerts ended up as false positives, whether alerts were unsubstantiated or proved to be false.

A report by the Suffolk County Police Department in New York analyzed 212 ShotSpotter alerts over a nearly eight-month period ending in March 2013 and found more than 30 percent of gunshot notifications were false. More than 62 percent of the alerts were unsubstantiated. The department subsequently discontinued ShotSpotter service.

Eddlemon, however, likened ShotSpotter's unconfirmed calls of gunfire to false fire or hold-up alarms — they are unavoidable, and keep officers vigilant.

"ShotSpotter is a tool, and it has consistently paid dividends. But like any tool, especially sophisticated electronic equipment, it can fail," Eddlemon said. "We're still no worse off by checking that."

When ShotSpotter works to its full potential, officers can use its data to confirm the stories of victims and witnesses, Eddlemon added. The alerts also can clue in police on patterns of behavior involving gunfire and contribute to officer safety where gunshots have been detected with regularity.

Police have identified a third possible 3-square-mile expansion of the service to cover additional areas of Central Peoria, including areas of frequent violence, such as the Lexington Hills apartments. If that expansion comes online in the future, the ShotSpotter system would cover 90 percent of locations in the city where shots fired calls have originated.

Matt Buedel can be reached at 686-3154 or mbuedel@pjstar.com. Follow him on Twitter @JournoBuedel.

# The Herald News

## 'False alarms' lead Fall River to ditch ShotSpotter system

By Brian Fraga
**Herald News Staff Reporter**
Posted Jul 27, 2017 at 4:36 PM
Updated Jul 27, 2017 at 4:45 PM

With an annual cost of about $90,000, Fall River Deputy Police Chief Al Dupere said he and other local officials decided the money would be better used to expand video surveillance system.

FALL RIVER — The Fall River Police Department is no longer using ShotSpotter, the gunshot detection system that local officials say had police officers responding to several false reports of gunfire while missing actual shots-fired incidents in Fall River.

With an annual cost of about $90,000, Fall River Deputy Police Chief Al Dupere said he and other local officials decided the money would be better used to expand the police department's video surveillance system in the city.

"Video is something that we use all the time in court. It's been very helpful to us," Dupere said, adding that a ShotSpotter activation in Fall River has never been used as evidence in court since the city began using the system in January 2013. As for helping police to solve gun crimes, Dupere said the only case in which he could recall the system playing an important role was an investigation where the sensors detected that two different guns were used in the same shots-fired call.

"It was somewhat helpful that we knew we were looking for two guns," Dupere said. "But it has never led us to a suspect."

A representative from the California-based ShotSpotter did not immediately return a phone call Thursday seeking comment.

When local officials announced in October 2012 that Fall River would become the fifth city in Massachusetts to adopt ShotSpotter, the technology was hailed as an effective crime-fighting tool that would enable police officers to respond to shooting scenes quicker, interview witnesses sooner and arrest suspects that could otherwise get away. The system is designed to report the caliber of weapons used in a shooting, determine the direction of gunfire and even record the shooter's movement.

ShotSpotter's acoustic sensors — which cover about three square miles in Fall River — are supposed to triangulate gunshot locations and relay the information almost in real-time to police dispatchers. While other communities have reported using it successfully, the system in Fall River has never operated smoothly, in part because the city's hills make it more difficult for the sensors to triangulate the sound waves, officials said. Dupere said ShotSpotter has told the police department that it would need more sensors in certain locations.

"We've been working through this for several years now, and trying to straighten things out," Dupere said.

Out of Fall River's 51 ShotSpotter activations in 2017, 21 have been false alarms, a 41 percent error rate. The sensors often report loud noises such as car backfires and fireworks as gunshots.

Dupere said there have been another 15 ShotSpotter activations this year that police later determined were unfounded because the responding officers found no evidence of gunfire or any witnesses to corroborate that they had seen or heard gunshots.

"We need to decrease those false alarms because we can't waste manpower like that," Dupere said.

Besides the false alarms, there have been instances where ShotSpotter in Fall River failed to report gunshots, even in neighborhoods where the sensors are located. Around 1:15 a.m. Monday, a man exited a vehicle near the corner of Palmer and Wilbur streets and fired three shots at a man walking on the sidewalk, witnesses said. Police learned about that incident because neighbors called 911. ShotSpotter never reported the gunshots.

With similar numbers of missed gunshots and false alarms over the last couple of years, Dupere said he spoke with the mayor's office and the Bristol County district attorney's office about not renewing the city's contract with ShotSpotter. The district attorney's office paid $50,000 annually, with the remainder being picked up by the police department.

"It's not that it's not a useful system to some degree, but it's not the best — public safety-wise — that we can get," Dupere said.

City Councilor Pamela Laliberte-Lebeau, the chairwoman of the City Council's Public Safety Committee, said she will be asking the police department about ShotSpotter at an upcoming committee meeting. She said the system, if operating correctly, can serve as an important resource in situations where neighbors fail to report gunshots.

"I would like to hear from police how often that happens," Laliberte-Lebeau said. "If that's what's catching the shots-fired and not necessarily people calling it in, then I would hate to see it go. I would like to hear the details."

City Councilor Richard Cabeceiras, also a member of the Public Safety Committee, said public safety technology such as ShotSpotter is a necessary investment.

"Every little bit we can use to keep our people safe is important," Cabeceiras said.

Since notifying ShotSpotter that the city would not be renewing its contract, which expired on June 30, Dupere said the company has offered to work out the system's kinks. So for now, the sensors and equipment are still in place, and technicians are trying to improve the system at no cost to the city. When the system is back up and running, Dupere said, the police department will have a trial run. He added that the department would reconsider using ShotSpotter at a decreased cost. He said the company has been successful in other communities with approaching local nonprofits to fund the system.

For now, Dupere said, the Fall River Police Department is moving forward with plans to expand its video surveillance system. He said the department has put out a request for proposal, with bidding to start next week.

*Email Brian Fraga at bfraga@heraldnews.com.*

8/30/2018
Rochester crime: Evidence-collecting tool called into question
1:18-cr-10046-JES-JEH   # 20   Page 21 of 29

ONLY $1 FOR 3 MONTHS

Subscribe
(http://promotions.democratandchronicle.com/specialoffer?
gps-
source=BENBaug&utm_medium=nanobarap1&utm_source=bounce-
exchange&utm_campaign=2018LABORDAY)



**Criminal Justice
Program**

Open doors to new career

Pg. 21 of 28

   University of Cincinnati

# Is shot spotter reliable enough? Critics question human equation behind technology

Gary Craig, @gcraig1   Published 7:00 a.m. ET Nov. 17, 2017 | Updated 11:13 a.m. ET Nov. 20, 2017



For Rochester police, the gunfire detection system known as ShotSpotter (http://shotspotter.com/) has been a valuable tool, alerting them to possible shootings (/story/news/2016/09/06/shotspotter-technology-gun-violence/89764672/) and speeding up the police response time.

But, more than that, the system — which tries to locate gunfire through audio sensors placed in high-crime areas in the city — has also become part of courtroom testimony, with prosecutors using the recordings as evidence to bolster their allegations of where and how many shots were fired in criminal incidents.

*(Photo: Provided photo)*

However, the latter use — evidentiary support for prosecutions — is coming under increasing attack, as critics say the system's use is being stretched beyond its scientific and analytical limits. The New York City-based Innocence Project, which has helped exonerate nearly 200 wrongly convicted people, recently filed a legal brief in a Rochester criminal case, challenging the reliability of ShotSpotter when it is used for more than a gunfire alert system.

"At the end of the day this is a machine that basically can tell you that there was a loud sound and then a human has to tell you whether it was gunfire or not," Dana Delger, an attorney for the Innocence Project, (https://www.innocenceproject.org/) said of ShotSpotter in a telephone interview.

In Rochester, ShotSpotter has been used as proof in several high-profile trials, most notably the trials of the men accused of the shooting in front of the Boys & Girls Club on Genesee Street that left three dead, and the murder of Rochester Police Officer Daryl Pierson by Thomas Johnson III. (/story/news/2015/05/08/thomas-johnson-jury-deliberations/26971569/)

The ShotSpotter-captured audio can give a jury a realistic picture of the events of a crime, said Monroe County First Assistant District Attorney Perry Duckles.

"ShotSpotter provides a captured audio of a point in time that we're trying to explore at any given trial," said Duckles. "When it captures that sound it brings a jury there. It allows them to hear what actually happened the night in question."

With the Johnson trial, prosecutors were able to synchronize the ShotSpotter audio with surveillance videos, giving the jury not only a visual of the fatal shooting of Pierson but also the accompanying sounds of the gunshots.

But some critics see a system that is evolving in court beyond its original purpose of an alert mechanism.

"There's a few things that are problematic," said Monroe County Assistant Public Defender Katie Higgins, who challenged the use of ShotSpotter audio in a recent criminal trial. "One is that it was designed to be an investigative tool for the police, to alert them to possible gunfire and allow them to respond to see if there are civilian witnesses or other evidence of gunfire.

"But it was not designed to be used as actual primary evidence (in a trial)," she said.

ShotSpotter needs to be subjected to more rigorous testing, from outside unbiased sources, to ensure its accuracy in courts, the critics say.

"While this technology may have advanced to the point where its data can be used as an investigative tool, it is not sophisticated enough to generate data that is reliable enough to be admitted as 'scientific' evidence in a criminal trial," the Innocence Project's Delger wrote in her brief filed in the Rochester case of Silvon Simmons, who was accused of trying to fatally shoot a police officer in 2016.

## Alerting to crime

When the city of Rochester first contracted with California-based ShotSpotter in 2006, the company placed its audio sensors — advertised as "gunfire specific acoustic-sensing technology" — in several city areas with high crime rates.

Currently, the sensors cover more than seven square miles of the city, according to Paul Greene, the company's manager of forensics services. Fifteen to 20 sensors are used to cover a single square mile, Greene said in recent trial testimony.

Rochester now pays $130,000 annually to ShotSpotter, a cost that also includes the testimony at trials.

The sensors are microphones with transmitters attached, and they're located at different elevated spots around the city, ranging from utility poles to privately owned buildings. (ShotSpotter does not publicly release the locations.)

The sounds are transmitted to the company computers, which then studies the audio impulses and the likely distance from the monitoring sensors (at least three sensors need to register the sound for a determination of location). The computers subject the transmitted pulses to algorithms to try to determine the location and source, whether gunfire or something else, such as firecrackers or a backfiring car.

Those equations then offer a location for a likely shooting incident.

An analyst reviews the audio for "classification verification" — essentially deciding whether the computer was likely correct if it determined the sound was gunfire.

From the sound to notification to a 911 system and police of possible gunfire can take only a minute.

"It's not just a recording at that point," Duckles said. "It's actually a scientific analysis of the recording."

Police or prosecutors cannot make a sweeping request for long swaths of audio, said Special Assistant District Attorney Julie Hahn, who heads the office's major felony bureau and was one of the prosecutors in the Silvon Simmons case. Instead, the company provides the very narrow audio window when shots were fired, which is typically only seconds in duration.



"They will only provide us the pulses, the shots, which occurred with (a particular) incident," she said. Otherwise, Hahn said, the audio could be a privacy breach, possibly capturing snippets of loud street-level conversations or other sounds not connected to an investigation.

The company safeguards its information, and the proprietary relationship with its contracting municipalities gives ShotSpotter a different position than crime laboratories or medical examiner offices whose personnel might testify in a criminal trial about, for instance, forensics or likely causes of death.

A crime lab, for example, is typically a publicly funded operation, and its scientific processes are often an open book for prosecutors, defense lawyers, or forensics experts to explore and dissect for reliability. ShotSpotter officials contend that the algorithms are, like the Colonel Sanders fried chicken recipe, a proprietary company secret.

**Silvon Simmons** *(Photo: Provided photo)*

For defense lawyers, the relationship with the city and ShotSpotter is problematic, blocking them from a review that could show, for example, whether the sensors have been checked or serviced.

ShotSpotter says its research shows that the system is accurate 80 percent of the time within a 25-meter range from a shooting. Critics say that more peer review testing is needed to verify the system's accuracy.

## A police shooting

On April 1, 2016, the ShotSpotter sensors picked up several audio bursts from a northwest Rochester neighborhood. Unable through its algorithms to detect a specific location, the system did not alert 911 or police. The system also thought the sounds to be the whirring blades of a helicopter, and not gunfire.

However, that night Officer Joseph Ferrigno chased Silvon Simmons (/story/news/2017/10/31/cop-shooting-case-steps-into-volatile-debate-over-police-community-relations/777395001/), behind an Immel Street home. Ferrigno said Simmons shot at him once, then Ferrigno fired four shots, hitting Simmons three times.

Simmons was charged with attempted murder of a police officer and criminal possession of a weapon.

Police notified ShotSpotter of the shooting, and the company revisited the audio from the scene. The analysts at first thought there were three shots, then changed to number to four, then five. Analysts found the fifth shot after a prosecution request to review the audio again, prosecutors say.



The 9mm handgun that police allege Simmons used. *(Photo: Evidence photo)*

Simmons' attorneys unsuccessfully sought to have the evidence withheld at trial, claiming that the changes from ShotSpotter officials showed a questionable coziness with authorities and the police version of the shooting. Prosecutors said the audio, once revisited, revealed the clear sounds of five shots.

The evidence was allowed. The jury heard the audio and acquitted Simmons of attempted murder but convicted him of criminal possession of a weapon. The jury may have decided that Simmons had a gun that accidentally discharged, attorneys surmised after the verdicts.

Attorneys agree that the ShotSpotter audio and testimony that there were five shots were crucial at Simmons' trial.

Because the system relies so heavily on a human review of the computerized data, there is a distinct possibility of "cognitive bias" — a determination that can be influenced by factors other than facts, the Innocence Project argued in the brief it filed in the Simmons' case.

In its brief, the Innocence Project highlighted the Rensselaer County trial of a man who fired shots at a police officer. In that case, one ShotSpotter analyst heard four gunshots in the captured audio file; another analyst heard three and said the fourth sound was likely a car backfiring.

The prosecution theory was that three shots were fired. The analyst who agreed with that number overrode the analyst's report of four shots and testified of his conclusion of three shots at the trial.

"This episode shows not only the subjective nature of the determination that a sound is actually the sound of gunfire, but also shows how ... (as here) information from the police may affect the conclusion of the analyst that a particular sound is gunfire," the Innocence Project argued.

Prosecutors say that they typically use ShotSpotter proof as supporting evidence in cases where there is no question a shooting occurred, such as the Genesee Street mass shooting, the murder of Officer Pierson, or the Immel Street shooting that led to Simmons' arrest and trial.

Buy Photo



A woman mourns after a drive-by shooting Aug. 19, 2015, outside the Boys & Girls Clubs on Genesee Street in Rochester left three people dead and four injured. The callousness of the mass shooting, seen by many as an assault on a refuge in an often troubled neighborhood, left much of the community shaken. The violence came suddenly and ended quickly; the devastation was overwhelming. (Photo: Staff file photo)

## Investigative tool

The worth of ShotSpotter can be tough to argue, with its quick alerts to police of a detected shooting incident. Witnesses have been found and criminal cases solved because of the rapid ShotSpotter alerts.

While some cities — including Charlotte and Detroit — have abandoned the system, deciding the occasional false-positive alerts were too problematic, many cities, like Rochester, have decided the system is a valuable crime-fighting mechanism.

Almost 90 cities in the United States and elsewhere now use the system, according to the company.

"It's just a great tool to have with its analytics as far as being able to narrow down a (shooting) location," said Lt. Jeremy Lindauer.

Buy Photo



Police investigate a homicide in August 2016 in the Sherman Street area after a ShotSpotter alert and neighbors called 911. (Photo: TINA MACINTYRE-YEE, @tyee23/staff photographer)

Eric Piza, an associate professor (http://fsdrecertification.com/faculty/eric-piza) at John Jay College of Criminal Justice, said that ShotSpotter has been valuable in cities where residents in high-crime neighborhoods have grown inured to the sounds of gunfire and don't always call police.

Piza, who previously worked as a crime analyst with the Newark, New Jersey, Police Department, said that when asked if a locality should use ShotSpotter, his standard answer is, "It depends."

"I think the first important question to ask is what are you trying to get out of this technology," Piza said. " ... The empirical research that has been done on ShotSpotter suggests it might not affect crime reduction."

Piza said he has yet to see research that studies ShotSpotter's reliability when used for specific evidentiary purposes in trials.

ShotSpotter Chief Executive Officer Ralph Clark said the courtroom challenges to ShotSpotter evidence are to be expected, similar to challenges by defense attorneys to most forensics-type evidence.

The challenges are "normal court procedural motions, ones we see repeated time and time again whereby ultimately the evidence was ruled admissible and we testify as experts," Clark said.

Still, those who question the evidentiary use of ShotSpotter data say that judges should subject the company's systems to the same scientific analysis that has been required for the admission of evidence ranging from fingerprints to DNA. And that would require the company to open its system to outside review.

At Simmons' trial, ShotSpotter forensics service manager Greene said of the company, "We're not required to have peer review but we're open to it."

Assistant Public Defender Higgins said she hopes that day comes.

"It needs to be ... generally accepted within a wider scientific community," she said.

*GCRAIG@Gannett.com*

Read or Share this story: http://on.rocne.ws/2mBGmz2

Search for questions, people, and topics

Ask New Question    Sign In

Technologies in Law Enforcement    Police and Law Enforcement

# How can acoustic gunshot detection systems help law enforcement?

Ad by Aha!

**What is the best product roadmap tool?**

Build brilliant roadmaps in minutes. Trusted by over 200,000 users worldwide. Start a free 30-day trial.

Free trial at aha.io

## 1 Answer

 **Jennifer Doleac,** Founder of the Justice Tech Lab & UVA economics professor
Answered May 10, 2017 · Featured on Forbes

The main purpose of acoustic gunshot detection systems (AGDS) — which detect gunfire incidents and triangulate their precise locations — is to allow police to get to the scene of gunfire faster than they would have if they had to rely on 911 calls (which might never come). If AGDS reduces police response times, and increases the likelihood that police show up to scenes of gunfire incidents, it could have several outcomes:

1. **Increase the probability that people who fire guns in urban areas get caught.** This could happen if police are better able to collect evidence (like shell casings, which can then be entered into NIBIN) or interview witnesses at the scene, or in some cases if they're able to catch the gunman before he leaves the scene.

2. **Decrease gun violence.** If gunmen are more likely to get caught, this should take serial offenders off the streets more quickly, and deter others from using guns in areas covered by AGDS.

3. **Displace gun violence to other neighborhoods.** Of course, it's possible that criminals learn that the cops show up quickly when they fire a gun on this street corner, but not if they move five blocks to the east. In that case, we might see gun violence shift from areas covered by AGDS to areas not covered.

4. **Save more gunshot victims.** If police can respond to gunfire incidents more quickly, they may also be able to get medical help for any victims more quickly. This could save lives.

5. **Improve relationships between police and community residents.** In many violent neighborhoods, residents don't call 911 when they hear gunfire because they don't trust the police to help. But many police officers would note that they can't demonstrate they care unless people call them. AGDS allows police to go to neighborhoods where gunfire was detected and have positive interactions with community members — for instance, knock on doors to ask if everyone's okay — without

✎ Still have a question? Ask your own!

**What is your question?**       Ask

## Related Questions

How was Assyrian law enforced?

Do major airports in the US have gunshot detection systems?

Will AI help law enforcement be more efficient?

What UAVs are used in law enforcement?

How do I get law enforcement to help pursue hackers attempting to extract data from my systems?

How are UAVs used in law enforcement?

Which laws do police officers least enjoy enforcing?

How do law enforcement units use truncheons?

What law enforces the payment of tickets?

Why are laws enforced?

+ Ask New Question

### In other languages

En español: ¿Cómo pueden ayudar los sistemas acústicos de detección de disparos de armas de fuego a los cuerpos policiales?

1:18-cr-10046-JES-JEH # 26 Page 27 of 29

6. **Collect high-quality data on gunfire.** A major challenge in studying gun violence (and crime in general) is that reporting rates are often very low, particularly in neighborhoods where residents don't trust the police. This makes it difficult to accurately measure the effects of local policies on gun violence. If we want to reduce gun violence, we need better, more complete data. AGDS data are the full universe of gunfire incidents in a covered area, with precise timestamps and geocodes. This is very useful to researchers, as well as to community members who want to understand violent crime patterns in their communities.

These are all *potential* benefits of AGDS. What are the actual benefits? We have no idea. There has been no rigorous evaluation of AGDS on outcomes 1–5. The benefits associated with outcome 6 — better data — depend on having *access* to the data. Unfortunately the main AGDS provider, ShotSpotter, writes in its contracts with cities that the firm (not the city) owns the data. This means that unlike crime data, these data are not public record. Police departments aren't allowed to share the data with researchers, journalists, or community members. Many departments are fine with that, as releasing the data could make them look bad (AGDS typically detects far more gunfire than was previously reported). But it means that many communities are not benefiting from this improvement in data quality.

**Punchline:** As of right now, it is unclear what communities are getting for their money when investing in acoustic gunshot detection systems. Residents should insist on evaluation and data ownership when paying for this technology.

815 Views · View Upvoters · Answer requested by Christopher VanLang

Promoted by Asana.com

**Organize your team's projects & work in one place with Asana.**

Elevate your team by improving workflow & productivity. Get your team on a trial of Asana today.

Free trial at asana.com

Related Questions

How was Assyrian law enforced?

Do major airports in the US have gunshot detection systems?

Will AI help law enforcement be more efficient?

What UAVs are used in law enforcement?

How do I get law enforcement to help pursue hackers attempting to extract data from my systems?

How are UAVs used in law enforcement?

Which laws do police officers least enjoy enforcing?

How do law enforcement units use truncheons?

What law enforces the payment of tickets?

Why are laws enforced?

Should dogs be used in law enforcement?

✏ Still have a question? Ask your own!

**What is your question?**

[ Ask ]

Related Questions

How was Assyrian law enforced?

Do major airports in the US have gunshot detection systems?

Will AI help law enforcement be more efficient?

What UAVs are used in law enforcement?

How do I get law enforcement to help pursue hackers attempting to extract data from my systems?

How are UAVs used in law enforcement?

Which laws do police officers least enjoy enforcing?

How do law enforcement units use truncheons?

What law enforces the payment of tickets?

Why are laws enforced?

+ Ask New Question

Is profiling helpful to law enforcement?

+ Ask New Question

### Related Questions

How was Assyrian law enforced?

Do major airports in the US have gunshot detection systems?

Will AI help law enforcement be more efficient?

What UAVs are used in law enforcement?

How do I get law enforcement to help pursue hackers attempting to extract data from my systems?

How are UAVs used in law enforcement?

Which laws do police officers least enjoy enforcing?

How do law enforcement units use truncheons?

What law enforces the payment of tickets?

Why are laws enforced?

+ Ask New Question

About · Careers · Privacy · Terms · Contact

✏ Still have a question? Ask your own!

## What is your question?

[ Ask ]



CLERK OF THE COURT
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION
100 NE. MONROE
PEORIA, IL. 61602

TERRILL RICKMON JR.
301 N. Maxwell Rd.
PEORIA, IL. 61604