IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT PEORIA

| | |  | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Case No. 18-10046 | |
| | ) | | |
| TERRILL A. RICKMON, SR., | ) | | |
| | ) | | |
| Defendant. | ) | | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS**

The United States of America hereby files its response to the defendant's motion to suppress evidence (R.20). For the reasons stated herein, defendant's motion should be denied.

I.     FACTS[1]

On July 29, 2018, Officer Travis Ellefritz ("Ellefritz") and numerous other Peoria Police officers were dispatched to 2203 North Ellis Street, an area known by Ellefritz to be a residential district. The initial dispatch was in reference to

---

[1] The facts set forth in this section are derived from reports prepared by the Peoria Police Department; dash camera video from the Peoria Police Department; audio recordings of 911 calls received by the Peoria Police Department; audio recordings of radio communications between dispatch and officers of the Peoria Police Department; audio recordings of gunfire detected by the ShotSpotter gunfire detection system; specific gunfire incident data from ShotSpotter; Peoria Police Department automatic vehicle locator (AVL) data regarding squad car location information; and Google Maps. The government is prepared to submit these items to the Court.

several alerts from ShotSpotter, a gunshot detection system that uses acoustic sensors placed in certain coverage areas in the City to triangulate and pinpoint gunfire locations. City of Peoria dispatch records indicate an incident "begin time" of 4:41:40 AM.[2] (Discovery Bates #1215; Attached Exhibit 1).

In the initial radio transmission to Ellefrtiz and other officers, dispatch advised, "2203 North Ellis, showing 2 rounds." While Ellefritz was en route to the location of the shooting, dispatch advised of another ShotSpotter alert, stating, "getting a second one, same location, showing two more rounds." Dispatch then provided additional information obtained from a 911 call, stating "cars en route to Ellis, there's several cars leaving, last seen going northbound on McClure." Dispatch then advised, "there's also a black male on foot who ran northbound on McClure[3] – I'm taking a call on this as well."[4]

Ellefritz approached the area in his patrol car from McClure Street with his headlights extinguished. He turned left from McClure onto North Ellis and

---

[2] The ShotSpotter alert system includes an Incidents & Reports Portal (IRP) designed to store information and data pertaining to each gunfire and non-gunfire related incident captured by the system. The IRP for the instant incident reported four shooting incidents at 2203 N. Ellis on July 29, 2018. The IRP reported 2 rounds fired at **4:40:02 AM**; 3 rounds fired at **4:40:08 AM**; 2 rounds fired at **4:40:39** AM; and 8 rounds fired at **4:40:44** AM (Discovery Bates #54; Attached Ex. 2).

[3] McClure Avenue runs from east to west.

[4] Peoria Police received five (5) 911 calls reporting gunshots related to the shooting on N. Ellis on July 29, 2018. To justify the stop in the instant case, the government relies only upon one 911 call – the male caller that provided information that was then conveyed to responding officers by dispatch prior to the traffic stop. *See United States v. Brewer*, 561 F.3d 676, 678 (7th Cir. 2009) *citing Florida v. J.L.* 529 U.S. 266, 271 (1968) ("The reasonableness of the suspicion must be measured by what they officers knew before they conducted their search.")

proceeded south. As he continued southbound, Ellefritz observed the headlights of a vehicle heading northbound from the dead end of Ellis, directly in front of the area where both ShotSpotter alerts indicated that shots had been fired, 2203 N. Ellis. The defendant, Terrill A. Rickmon, Sr. ("Rickmon"), was the front passenger in that vehicle. Ellefritz did not see any other cars traveling in the area. As the vehicle approached from the opposite direction, Ellefritz turned on his headlights and then turned on his overhead emergency lights. As it came closer, Ellefritz illuminated the passenger compartment of the approaching vehicle with a spotlight. Ellefritz observed an African American male driver, an African American male in the front passenger seat (Rickmon), and an African American female in the backseat. Ellefritz stopped his patrol car in front of 2222 N. Ellis, approximately 7 houses north of the shooting location at 2203 N. Ellis. *See* Exhibit 3-1; 3-2.[5] The approaching vehicle stopped just before passing Ellefritz' patrol car, then reversed and began to drive backwards and away from Ellefritz' patrol car. Ellefritz then radioed to dispatch that the vehicle, bearing license plate number 12974, was "trying to take off."[6]

While the vehicle was moving backwards, the driver pointed his arm out

---

[5] Google Maps indicates a distance of 276 feet between 2203 N. Ellis and 2222 N. Ellis (Attached Ex. 3-2).
[6] Based on the dispatch recordings, approximately **3 minutes and 31 seconds** passed from the time *dispatch* reported shots-fired and *Officer Ellefritz* reporting the license plate number of the vehicle and indicated that it was "trying to take off."

the window back toward the dead end of the street while yelling, "they are down there! They are still down there!" Ellefritz exited his patrol car with his weapon drawn and ordered the occupants to put their hands up and the driver to stop the vehicle. Ellefritz stood at the driver's side of the vehicle with his flashlight pointed at the occupants and his firearm held near his right hip. The driver continued to yell, "they are still down there! They are still down there!" Ellefritz looked south toward the dead end and observed a crowd of approximately 25 to 30 people.

While waiting for backup to arrive, Ellefritz repeatedly instructed Rickmon and the driver to keep their hands up as he had observed them reaching around the vehicle. Rickmon told Ellefritz that he (Rickmon) had been shot and Ellefritz observed blood on Rickmon's forehead, above his right eye.

When backup officers arrived, Rickmon stepped out of the vehicle and showed officers that he had been shot in the rear of his right leg. Blood stains were observed on the right front passenger seat where Rickmon had been sitting and on the exterior of the passenger side of the vehicle. Pursuant to consent provided by the driver[7], officers conducted a search of the vehicle and located a loaded black and gray 9mm handgun under the right front passenger seat. The firearm appeared to have dried blood on the slide and grip.

---

[7] The driver is the registered owner of the vehicle.

4

## II. PROCEDURAL HISTORY

On August 21, 2018, defendant Terrill A. Rickmon, Sr. was charged in an indictment, which alleges that on or about July 29, 2018, defendant, previously having been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess a firearm, a SCCY CPX-1, 9mm caliber handgun, in that the firearm had traveled in interstate commerce prior to the defendant's possession of the firearm, in violation of Title 18, United States Code, Section 922(g). Defendant has pleaded not guilty to the charge.

In his motion to suppress, defendant asserts that Officer Ellefritz lacked probable cause and reasonable suspicion to justify the stop of the vehicle in which he was a passenger. Docket No. 20, ¶22. Defendant concludes that the traffic stop was a violation of the Fourth Amendment and, "as a result, the fruits of the subsequent search, which were obtained by exploitation of the illegal seizure, is to be deemed inadmissible against the Defendant and excluded from trial in the present case." Docket No. 20, p. 10.

## III. LEGAL STANDARD

Officers may conduct an investigatory stop of a vehicle if articulable facts support a reasonable suspicion that criminal activity is afoot. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). Reasonable suspicion is a "less demanding standard than probable cause," it "can be established with information that is

different in quantity or content than that required to establish probable cause," and it "can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). The determination of whether the officer had reasonable suspicion is an objective inquiry based on the totality of the circumstances known to the officer at the time of the encounter. *United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008) (*citing United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972).

IV.    ARGUMENT

Officer Ellefritz had reasonable suspicion to stop the vehicle in which the defendant was a passenger. Ellefrtiz was dispatched to a 2203 N. Ellis in response to an alert from ShotSpotter that 2 rounds of gunfire had been discharged. Ellefritz knew that 2203 N. Ellis was a residential neighborhood. While en route, Ellefrtiz was informed that another 2 rounds of gunfire had occurred at the same location. Prior to his arrival at the scene of the shooting, dispatch advised Ellefritz (and other officers) with details from a 911 call, therein advising that there were cars leaving the area of the shooting. Dispatch further relayed information from the 911 call that there was "also a black male who ran

northbound on McClure." Ellefrtiz was aware that the details had been provided by a 911 call, as dispatch specifically advised, "I'm taking a call on this as well."

The need for dispatch in this case was as serious as it gets – multiple reports of gunfire in a residential area, indicating that there was an ongoing situation. Officer Ellefritz arrived on scene and initiated a traffic stop of the subject vehicle approximately 3 and ½ minutes after he was dispatched to the shooting.

The level of urgency for police action is a key factor in whether a tip provides reasonable suspicion. In fact, *United States v. Drake,* 456 F.3d 771, 775 (7th Cir. 2006), created a presumption of reliability for "an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion." Also, in *Wooden,* a caller left an anonymous tip in a 911 call saying he had observed a tall black male in a certain public location dressed a certain way pull a gun from a holster while arguing with his girlfriend. *United States v. Wooden,* 551 F.3d 647, 648 (7th Cir. 2008). The Court of Appeals relied on the need for dispatch in responding to a crime in progress reported by an anonymous eyewitness to find that a *Terry* stop was supported by reasonable suspicion. *Id.* at 650 ("…*Terry* stops are brief, and people can quickly go on their way if the call proves to be unfounded. So we reiterate our holding of *Drake* and *Hicks* that a need for dispatch can make reasonable a stop that would not be reasonable if the

7

police had time to investigate at leisure."). Similarly, in *United States v. Hicks*, 531 F.3d 555 (7th Cir. 2008), an identified 911 caller reported an armed man was in the process of beating a women. *Id.* at 556. The Court of Appeals held there was reasonable suspicion because the informant identified himself and reported an ongoing emergency, and the subject matched the description given to the law enforcement officer that stopped him. *Id.* at 560.

Even absent the imminent danger factor in this case, the totality of the circumstances supports that reasonable suspicion existed to justify a stop of the vehicle, including: the short lapse of time between the dispatch and the stop (3 ½ minutes), the 911 call indicating that vehicles were leaving the area and that an African American was observed leaving on foot, the stop's proximity to the reported shots (less than 300 feet away – 7 houses north), the fact that the vehicle was the only vehicle officer Ellefritz saw traveling on N. Ellis in the early morning hours (around 4:45 a.m.), and the fact that N. Ellis was a dead end street and the vehicle was exiting from the dead end.

It was natural to surmise that whoever fired the shots had left the area, and the street that the vehicle was driving on was the only street leading to the scene of the shooting, and the vehicle was driving away from the scene rather than towards it. If the gunman was not an occupant of the vehicle, there was a good chance he was still down the street at 2203 N. Ellis – armed and dangerous. *See*

*Brewer*, 561 F.3d at 678 ("It behooved each member of the police team to obtain for his own safety and that of the other officers as much information about the situation [in an apartment complex] as he could before they entered it in the dark. The only vehicle leaving it may have been driven by an entirely innocent person who nevertheless had valuable information.").

In such a situation as the instant case, it is reasonable for police to act quickly and not lose the only opportunity they may have to solve a recent violent crime or to interrupt an advancing one. *See United States v. Burgess*, 759 F.3d 708, 711 (7th Cir. 2014) ("[R]easonable, articulable, particularized suspicion is not a matter of certainty, and recent reports of large caliber gunshots fired from a black car in a densely populated urban area added up to enough to permit a stop of [the] car and allow for further investigation.")

Finally, the conduct of the driver after Ellefritz turned on his overhead lights further supports reasonableness of the officer's suspicions. *See United States v. Chapman*, 954 F.2d 1352, 1357 (7th Cir. 1992) ("[The suspect's] initial refusal to stop his truck when the officers signaled him to pull over reinforced the reasonableness of the officers' belief that [the driver] had committed or was committing a crime.") (internal quotations omitted). In this case, Ellefritz concluded that the vehicle was "trying to take off" after he turned on his overhead emergency lights. Indeed, the dash camera video from Ellefritz' patrol

9

car depicts the subject vehicle stopping just in front of the patrol car, then reversing and moving backwards toward the dead end. The driver of the vehicle is simultaneously yelling, "they are down there…they are still down there!" while pointing toward the dead end of Ellis where the shootings occurred. Despite Ellefritz' commands to "stay where you are, right there" and to "stop" and "stop your car", the video reveals three separate occasions where the vehicle momentarily moves backwards and away from Ellefritz' patrol car. While the vehicle ultimately only traveled less than 8 feet backward, the reaction of the driver in backing away from the officer while shouting, "they are still down there" clearly conveyed to Ellefritz that the occupants of the vehicle had either witnessed the shooting or been involved in the shooting and were anxious to leave the area. In light of the totality of the circumstances known to Ellefritz at the time of the stop, reasonable suspicion existed to believe that a crime had been or was about to be committed and thus to conduct a vehicle stop under *Terry*.

Because the *Terry* stop was proper, the officers' subsequent seizure of a firearm was lawful as it was located pursuant to consent to search granted by the driver, the owner the vehicle.

V.   **CONCLUSION**

For the reasons stated above, the government requests that defendant's motion to suppress be denied.

VI. **ANTICIPATED WITNESSES**

    **a.** Officer Ellefritz, PPD

    **b.** Officer Rasmussen, PPD

    **c.** Officer Espinal, PPD

    **d.** Officer Wetzel, PPD

VII. **EXHIBITS**

1. Dispatch Log (Attached Ex. 1)
2. ShotSpotter Incidents & Reports Portal Map & Data (Attached Ex. 2)
3. Maps of N. Ellis (Attached Ex. 3-1; 3-2)
4. Dispatch Audio Recording (Un-Compressed) (Ex. 4)
5. Dispatch Audio Recording Transcript & Timeline (Ex. 5)
6. 911 Call Audio (Ex. 6)
7. Dash Camera Video of Officer Ellefritz (Ex. 7)
8. Video Animation of PPD Patrol Car Locations (AVL) on Map – Ellefritz Patrol Car (Ex. 8)
9. Video Animation of PPD Patrol Car Locations (AVL) on Map – All Responding Patrol Cars (Ex. 9)

Respectfully submitted,

UNITED STATES OF AMERICA

JOHN C. MILHISER
UNITED STATES ATTORNEY


**s/ RONALD L. HANNA**
RONALD L. HANNA
Assistant United States Attorney
One Technology Plaza, 4th Floor
211 Fulton Street
Peoria, Illinois 61602
Telephone:   309/671-7050

## CERTIFICATE OF SERVICE

I certify that on December 13, 2018, I filed a copy of the foregoing using the CM/ECF system, which will cause notice of the foregoing to be sent to:

Rob Alvarado
Attorney for the Defendant

By: /s/ _____
Allison Ramsdale, Paralegal Specialist