1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
2

3  UNITED STATES OF AMERICA,    ) Docket No. 18-cr-10046
                                )
4       Plaintiff,              )
   vs.                          )  Peoria, Illinois
5                               )  December 21, 2018
   TERRILL A. RICKMON, SR.,     )
6                               )
        Defendant.              )
7  _____)

8              RECORD OF PROCEEDINGS
9           MOTION TO SUPPRESS HEARING
              **CROSS-EXAMINATION OF**
10               **TRAVIS ELLEFRITZ**
        BEFORE THE HONORABLE JAMES E. SHADID
11          UNITED STATES DISTRICT JUDGE

12
                 THE APPEARANCES
13
               RONALD LEN HANNA, ESQ.
14             Assistant U.S. Attorney
           One Technology Plaza, Suite 400
15               211 Fulton Street
                 Peoria, IL  61602
16            On behalf of the Plaintiff

17
               ROBERT ALVARADO, ESQ.
18        Assistant Federal Public Defender
             401 Main Street, Suite 1500
19               Peoria, IL  61602
             On behalf of the Defendant
20

21

22             Nancy Mersot, CSR, RPR
           United States District Court Reporter
23               100 N.E. Monroe Street
                 Peoria, IL  61602
24
   Proceedings recorded by mechanical stenography,
25 transcript produced by computer-aided transcription.

1          (Proceedings were held in open court.)

2                    TRAVIS ELLEFRITZ,

3     after having been duly sworn, testified as follows:

4                    CROSS-EXAMINATION

5     BY MR. ALVARADO:

6     Q.   Officer Ellefritz, you were working a different

7     district from the Ellis Street district, correct?

8     A.   Yes, sir.

9     Q.   You were down at Abington and Perry, which was

10    several miles from the 2200 block of Ellis, isn't

11    that true?

12    A.   Yes, sir.

13    Q.   You were the first officer to arrive on the

14    scene?

15    A.   I was.

16    Q.   Now, you had testified earlier that you had

17    worked that -- you had gone to that area before, but

18    had you ever been assigned to the district involving

19    North Ellis?

20    A.   I have been assigned there, yes.

21    Q.   And you said -- also said that you had responded

22    to ShotSpotter calls in that area?

23    A.   Shots fired calls, yes, sir.

24    Q.   Did you ever respond to ShotSpotter calls to the

25    2200 block of Ellis before?

A.   I don't recall specifically what ShotSpotter
would have responded to there, no.
Q.   So you have no independent memory of ever going
to the 2200 block of Ellis to respond to a call from
ShotSpotter that shots had been fired?
A.   Not necessarily ShotSpotter, initially, sir, no;
but I know that I have gone to shots fired calls
there or someone may have called in shots fired, but
there may not have been an activation.
Q.   Okay.  On Ellis?
A.   Yes.
Q.   Now, did you -- have their been times in the
past when you have responded to ShotSpotter calls
anywhere in the city --
A.   Sure.
Q.   -- where you had not discovered independent
evidence that shots had been fired?
A.   Yes, yes.
Q.   Are you aware that -- actually, there are no
statistics for the Peoria Police Department as to
the number of false positives or false negatives
that the ShotSpotter system provides for the police.
A.   I would have no knowledge of that, sir.
Q.   But you were aware that ShotSpotter is not a
hundred percent accurate tool that Peoria police

1 use.

2 A. Okay. If that's what you're telling me, yes,

3 sir.

4 Q. And I assume you're also told not to completely

5 rely on ShotSpotter to indicate that gunshots were

6 fired at any particular location?

7 A. That's correct.

8 Q. Nevertheless, you received an indication that

9 shots had been fired at 2203 North Ellis?

10 A. Yes.

11 Q. From two different sources, correct?

12 A. Yes.

13 Q. The first source was the display that showed

14 from ShotSpotter that two shots had been fired at

15 2203 North Ellis?

16 A. That's correct.

17 Q. And you get that there is, I think, if I

18 understand this right, you have a separate monitor

19 in your squad car that would automatically open up?

20 A. It's the same computer screen, but, yes, a

21 separate -- a small bar would activate that would

22 pop up, and once I click on that, it would bring up

23 the ShotSpotter screen itself.

24 Q. I think you also said that you received an

25 audio. As part of that alert, there is an audio

1  component to that?
2  A.   It makes like a ringing or a chiming noise to
3  alert me.
4  Q.   So it is not that you are actually hearing the
5  sounds that were being recorded to you.
6  A.   No.
7  Q.   Although ShotSpotter does have that capability
8  so you could hear what ShotSpotter is supposedly
9  reporting.
10 A.   That's correct, yes.
11 Q.   So when you received the ShotSpotter call of two
12 rounds at 2203 Ellis, you immediately started going
13 towards that area?
14 A.   Yes, I did.
15 Q.   By the way, what were you doing at the time that
16 you received that alert?
17 A.   I was in my squad car.  I don't recall
18 specifically what I would have been doing.
19 Q.   Okay.  Were you moving or were you sitting?
20 A.   I believe I had just pulled up.
21 Q.   I'm sorry?
22 A.   I believe I just pulled up to that location, so
23 I'm sure that I probably --
24 Q.   To Abington and Perry?
25 A.   Yes.

Q.   So you were on the street at Abington and Perry?

A.   I don't recall my exact location, sir.  I just know the map showed me as near that intersection. As far as a parking lot or a street or a sidewalk, I couldn't tell you that; I don't recall.

Q.   Okay.  Now you generally worked third shift; is that right?

A.   That's correct.

Q.   So that's basically 11 to what time in the morning?

A.   11:00 p.m. to 7:00 a.m.

Q.   So I assume then you're well aware that if a particular tavern has a club license that those clubs close at 4:00 in the morning.

A.   Yes.

Q.   And you were responding to this shot call at approximately 4:30.

A.   Yes.

Q.   And regular bars close at 2:00 a.m., correct?

A.   Yes, I believe.

Q.   And I would assume, based on your experience working that third shift, that you notice an increase in traffic after 4:00 in the morning when everyone is leaving the clubs.

A.   Sure, that's correct.

Q.   And you can see traffic at any part of the
city --

A.   Yes.

Q.   -- after 4:00 in the morning.

A.   Yes.

Q.   And by the way, July 29th, when this incident
occurred, do you recall the day of the week it was?

A.   I don't sir, no.

Q.   Okay.  So you started moving towards 2203 Ellis
when you got the ShotSpotter call.  Approximately,
how long after that did you receive the dispatcher
call to head to that or actually just to check if
you were -- I assume that it's just to check to see
if you were available?

A.   I'm sorry?

Q.   Well, the dispatcher -- let's see.

     At 1:50, according to Government's
Exhibit 5, the dispatcher said Adam-10, Adam-13.

A.   Yes.

Q.   They were just --

A.   They are calling us.

Q.   -- calling you?

A.   Yes.

Q.   Both cars?

A.   Yes.

1 Q.   Do you know where Adam-13 was at that time?

2 A.   I don't.

3 Q.   What car was assigned to the Ellis district that

4 morning; do you know?

5 A.   There was no car assigned to that district at

6 that point.

7 Q.   Why is that?

8 A.   I don't know, sir.  There just wasn't enough

9 officers working that night to have an Adam-1 or a

10 3-Adam-11 that night.

11 Q.   How many Peoria Police Department patrol

12 vehicles were working at approximately 4:30 in the

13 morning?

14 A.   I don't know the answer to that, sir.

15 Q.   Okay.  So then the dispatcher also told you at

16 -- exactly -- well, at two minutes into the

17 recording that 2203 North Ellis showing two rounds;

18 is that right?

19 A.   Yes.  Yes, sir.

20 Q.   Now you already knew that because you had seen

21 your display.

22 A.   Yes.

23 Q.   And then you said seven seconds later, Adam-10,

24 10-4?

25 A.   Yes, sir.

1    Q.   You were just acknowledging that you received
2    that?
3    A.   I was acknowledging my dispatch call, yes.
4    Q.   When did you report that you were en route to
5    Ellis?
6    A.   I don't need to tell them that I'm en route.
7    Once they call me and I acknowledge that call, I'm
8    en route to that call.
9    Q.   So you did not notify the dispatcher that you
10   were en route to that call to 2203 Ellis?
11   A.   I'm afraid I don't understand you.  By me
12   acknowledging -- by me acknowledging Adam-10, 10-4;
13   I'm telling them "I heard your call; I'm
14   responding."
15   Q.   So what you're saying is that you are assuming
16   the dispatcher knows that you are en route.
17   A.   That's our common practice, sir.  That's what
18   all officers do.  I don't need to acknowledge
19   Adam-10, specifically, I'm en route.  By me
20   acknowledging the call then they know that I'm
21   responding.
22        MR. HANNA:  I think Mr. Alvarado is
23   referring to two different parts of the conversation
24   between Officer Ellefritz and dispatch.  If he could
25   have the benefit of looking at Government's Exhibit

Number 5, I think that that would clarify what he is
referring to.

    MR. ALVARADO:  I am referring to
Government's Exhibit 5.

    MR. HANNA:  Can we show that to the witness
so he understands what you are referring to?

    MR. ALVARADO:  Let me ask the witness --

    THE COURT:  Let me ask this first, and I
know that you have asked him to put the microphone
closer to him.  I'm going to ask that he moves it
away a little bit and then speak up.  Thank you.

    THE WITNESS:  Okay.

    THE COURT:  Go ahead.  Ask first as to --
BY MR. ALVARADO:
Q.  Officer Ellefritz, do you understand what I'm
asking you about the dispatcher to -- the dispatcher
messages to you?  Your messages to the dispatcher?
A.  I thought I did, sir, but if I could look at it,
I think that might help me to be able to answer your
question better.

    MR. ALVARADO:  Okay.  Do you have it?

    MR. HANNA:  I do.
BY MR. ALVARADO:
Q.  Officer, I'm going to show you -- may I approach
the witness?

1     THE COURT:  You may.

2  BY MR. ALVARADO:

3  Q.   I'm going to show you Government's Exhibit 5.

4  A.   Okay.

5  Q.   I think it has already been admitted into

6  evidence.  Actually, you can follow along while I'm

7  asking you these questions.

8  A.   Absolutely, sir.

9  Q.   If you want.

10       And does this refresh your memory about what

11 occurred that morning?

12 A.   Yes, it does.

13 Q.   Okay.  So after two minutes into the recording,

14 your dispatcher said 2203 North Ellis showing two

15 rounds.

16 A.   Yes, sir.

17 Q.   And then at seven seconds later, you said

18 Adam-10, 10-4?

19 A.   That's correct.

20 Q.   Now you are saying that that's a common practice

21 that that means that you're en route to Ellis?

22 A.   Yes, sir.  By them contacting me first, I

23 acknowledge it; they then dispatch me to the call.

24 I acknowledge that I have received the call and am

25 responding.

1 Q. Adam-13 didn't respond at all.

2 A. I believe he said Adam-13 en route. So he

3 acknowledged before he was dispatched to the call.

4 Q. Right. Why -- you said that it was a common

5 practice that you didn't need to indicate that you

6 were en route, Adam-13 did?

7 A. Dispatcher contacted him and he went ahead and

8 acknowledged "en route." He didn't need to hear the

9 dispatch. I prefer to hear the dispatch calls,

10 which is our common practice, and that's the way

11 that we were trained.

12 Q. Adam-13 didn't hear the call?

13 A. No, I'm saying he didn't need to hear the

14 dispatch call. He had already responded that he

15 understood. He had the same ShotSpotter screen that

16 I had.

17 Q. Well, take a look at the exhibit again because

18 I'm having a hard time understanding this.

19        The dispatcher said at 1:50, Adam-10

20 Adam-13.

21 A. Yes.

22 Q. At 1:53 you said, Adam-10, I'm here; basically,

23 is what you are saying.

24 A. Yes, I acknowledge.

25 Q. At 1:56, Adam-13 said, "Adam-13 en route."

1  A.   Yes, he did.

2  Q.   And then at two minutes into the recording, the

3  dispatcher said, "2203 North Ellis showing two

4  rounds."

5  A.   Yes.

6  Q.   And then you said, "Adam 10, 10-4."

7  A.   Yes.

8  Q.   And you say it is common practice that the

9  dispatch knew that you were already en route to

10  Ellis.

11  A.   That by me acknowledging them, I would be

12  responding, yes.

13  Q.   But obviously Adam-13 didn't know that that's

14  common practice because he said that he was en

15  route.

16  A.   I'm afraid I can't testify to why he said what

17  he said.

18  Q.   Well, the common practice only seems to be a

19  practice with you and whoever this dispatcher was,

20  right?

21  A.   I believe it would be common practice with all

22  of us, but why he didn't do it, I don't know, sir.

23  Q.   Okay.  Well, nevertheless, you started going

24  towards Ellis.

25  A.   Yes.

Q.   And I believe the testimony was that it took
about three and a half minutes to get there; is that
right?

A.   Yes, sir.

Q.   You received a dispatch as you were on your way
there.  At 2:59 in the recording, the dispatcher
said -- no, no -- back at 2:18 the dispatcher said,
"Getting a second one, same location, showing two
more rounds"; is that correct?  Did you hear that?

A.   Yes, I did.

Q.   And then at 2:24, you said, "Adam-10, 10-4."

A.   Yes.

Q.   You were basically saying you acknowledge that?

A.   Yes.

Q.   And it was common practice for you and this
dispatcher; he already knew that you were on your
way there.

A.   Well, I'm sure he would have known about that,
yes.

Q.   How would he know that?

A.   Because I already acknowledged that I received
the call.

Q.   Okay.

A.   I'm sorry.  Maybe I'm not understanding what
you're asking, sir.

1  Q.   Okay.  Let me move on.  Let me move on.

2  A.   Okay.

3  Q.   Did you notice on your display panel that the

4  second ShotSpotter call had come in?

5  A.   I'm sure I would have, but I don't recall

6  specifically bringing up that screen as I was

7  driving.

8  Q.   But you have no independent recollection of

9  receiving that?

10 A.   I don't have an independent recollection of the

11 second screen chiming at me; no, I don't, sir.

12 Q.   Okay.  By the way, did you see other cars on

13 your way to Ellis?

14 A.   I don't recall other cars, no.

15 Q.   And then you received another message from the

16 dispatcher at 2:59, and the dispatcher said, "Cars

17 en route to Ellis.  There are several cars leaving

18 but seen going northbound on McClure."

19 A.   Yes.

20 Q.   And meanwhile you're still heading towards

21 Ellis.

22 A.   Yes, sir.

23 Q.   Do you recall where you were when you received

24 that message?

25 A.   No, I don't, sir.

1  Q.   You don't know if you were already on McClure at
2  that time?
3  A.   I don't know, sir.
4  Q.   Now you know McClure is an east/west street.
5  A.   Yes, I do.
6  Q.   And the dispatcher was telling you that cars
7  were en router or -- let me see -- cars en route to
8  Ellis.  There's several cars leaving.  Last seen
9  going northbound on McClure.
10  A.   Uh-huh.
11  Q.   Did you notice that that couldn't possibly be
12  right?
13  A.   No, I noticed it has unintelligible, so maybe
14  they are saying going northbound towards McClure,
15  but I don't know, sir.
16  Q.   But you don't know that, do you?
17  A.   No, I don't.
18  Q.   All you knew was that cars were northbound on
19  McClure, right?
20  A.   I knew northbound and McClure, yes, sir;
21  northbound on McClure.
22  Q.   And that could not possibly have been right.
23  A.   No.
24  Q.   Did you respond to the dispatcher or
25  clarification about that?

1  A.   No, I didn't.
2  Q.   At 3:18 somebody I don't know if it's a dispatch
3  or another officer, said "Something on Ellis."
4       Then at 3:50 the dispatcher said again or
5  announced again "Cars en route Ellis.  There is also
6  a black male on foot who ran northbound towards
7  McClure.  I'm taking a call on this as well."
8       Is that what your heard?
9  A.   Yes.
10 Q.   Do you know where you were at that time you
11 received that?
12 A.   I don't recall where I would have been at that
13 point, sir.
14 Q.   So you then got to McClure, went westbound on
15 McClure, turned off your headlights when you were
16 getting close to Archer, correct?
17 A.   Yes.  Or to Ellis.
18 Q.   Or to Ellis, yeah.  And you say you did that for
19 concealment purposes?
20 A.   Yes, sir, to help mask our movement as opposed
21 to having overhead lights and headlights on as I'm
22 approaching a shots fired call.
23 Q.   So nobody could see you approaching,
24 essentially.
25 A.   Yes.

Q.   You turned left onto Ellis.

A.   Yes, sir.

Q.   And then at some point you turned your
headlights back on, and I believe that was -- you
turned them back on when you saw a car beginning to
come towards -- a car's headlights beginning to come
towards you.

A.   Yes.

Q.   You turned your headlights back on.  Did you
turn your overhead -- your emergency lights on?

A.   Yes, sir, I did.

Q.   So they were both on at that time?

A.   Yes.

Q.   You crossed Archer Street and then you made the
stop of this vehicle at 2222 North Ellis, correct?

A.   Yes, sir.

Q.   But I want to back up a little bit.  When you
first saw the headlights of that car, isn't it a
fact that the car was pulling from the left side of
Ellis as you were going southbound and turned right
onto Ellis and approached you?  In other words,
could you see -- could you see that the car came
from the left side of Ellis Street, somewhere to the
left of the street and turned right onto Ellis and
began approaching you?

A.   I recall it being a side profile.  I don't
recall whether it was facing east or west at the end
of that.  If I would have -- if I could look at a
video, maybe I could clarify that.

MR. ALVARADO:  Queue it up at about
15 seconds.

(Playing video.)

BY MR. ALVARADO:

Q.   And, officer, watch this as it is unfolding and
I will ask you questions about it.

A.   Yes, sir.

Q.   You just turned southbound onto Ellis.

MR. ALVARADO:  And I will tell you when to
stop, Phil.  Stop.

BY MR. ALVARADO:

Q.   Didn't you see the headlights coming from the
left side of Ellis Street turning to the right and
beginning to head towards you?

A.   Are you able to replay it for me, sir?

MR. ALVARADO:  Okay.  Could you back it up
just a few seconds?

(Playing video.)

BY MR. ALVARADO:

Q.   Okay.  You are on McClure again.  You are
turning south onto Ellis.

1          Did you see the headlights there?

2   A.   Yes, I did.

3   Q.   Did you see the headlights seeming to come from

4   the left of Ellis Street?

5   A.   It appears so, yes, sir.

6   Q.   And then turn right onto Ellis and begin to

7   approach you?

8   A.   I believe so, yes.

9   Q.   Now, from your vantage point, could you tell

10  what street address that car would have been coming

11  from?

12  A.   Not from there, no, sir.

13  Q.   In the dark you just cannot judge the

14  perspective of exactly where an object is?

15  A.   No, I knew it was near the dead end.  As far as

16  a specific address, no, I did not.

17  Q.   Right.  You knew that Ellis was a dead end to

18  the south.

19  A.   Yes, sir.

20  Q.   In fact the County Health Department is right

21  there, isn't it?

22  A.   That's correct, yes.

23  Q.   But you do acknowledge that it appears that that

24  car came from the left side of Ellis Street, whether

25  a driveway or an alley or whatever, it appears to be

turning onto the street from something off of the
street, right?

A.   It appears to be turning onto the street, yes,
sir.

Q.   And it appears to be heading -- like it didn't
back out of the driveway.  It seems to be coming
head forward and turning right northbound onto
Ellis, correct?

A.   Yeah, it appears that it is turning northbound
towards me.

Q.   Okay.

        MR. ALVARADO:  Continue playing the tape.

        (Playing video.)

BY MR. ALVARADO:

Q.   Okay.  You are crossing Archer Street.

A.   Yes, I am.

Q.   And the car is beginning --

        MR. ALVARADO:  Stop it.  Stop, Phil.

BY MR. ALVARADO:

Q.   Okay.  At that point you are already turning
your squad car actually going into the northbound
lane, aren't you?

A.   Yes.

Q.   And you were basically indicating to the driver
of that car that you intend to stop that car.

1  A.   Yes, I was.

2  Q.   And that car -- well, first of all, let me ask

3  you this:  When the car got closer, when you can see

4  other things about this car, you didn't notice

5  anything particularly unusual about this car, did

6  you?

7  A.   Not at this point, no, other than it was leaving

8  the scene where I was dispatched to.

9  Q.   And when you actually -- when this car came to a

10  stop, when its forward progress stopped, it wasn't

11  committing any traffic violation at that point, was

12  it?

13  A.   No, sir, it did not.

14  Q.   You didn't observe any safety violations on the

15  vehicle like a burn out?

16  A.   No IVC violations, no sir.

17  Q.   Okay.  No registration violations?

18  A.   None that I'm aware of.

19  Q.   There was no reason for you to pull this vehicle

20  over other than what you learned from the dispatcher

21  and from your ShotSpotter display, right?

22  A.   That's correct.  It would have been an

23  investigative stop at this point.

24  Q.   I'm sorry?

25  A.   It was an investigative stop.  It hadn't

committed a traffic violation, sir.

Q.   Okay.  In fact the car was not trying to flee
you, right?

A.   No.

Q.   Now, at some point while you are coming
southbound on Ellis, you actually said, "Adam-10,
10-7.  I got a car trying to take off northbound
here from the dead end on Ellis."

          Now you remember making that call?

A.   Yes, I do.

Q.   And that -- you made that before you could
actually even see the occupants of the car, isn't
that correct?

A.   That's correct, yes, sir.

Q.   And when you used that phrase "trying to take
off northbound here," you weren't trying to say that
it was fleeing?

A.   No.  I believe that's what I was meaning to say
at the time but --

Q.   I'm sorry?

A.   I believe that's what I was meaning to say that
I have a vehicle that is taking off north on Ellis
from the dead end.

Q.   Okay.  But within seconds you realize that the
car was slowing down and did in fact stop its

1 forward progress.

2 A.   That's correct, yes, sir.

3 Q.   And when -- you said a second time at 5:31 into

4 the tape "Adam call 12974, it's trying to take off."

5 A.   Yes, sir.

6 Q.   You said that approximately one second before

7 it's forward progress stopped, right?

8 A.   Yes, sir.  I believe so, sir, yes.

9 Q.   But it wasn't trying to take off at that point,

10 was it?  It was stopping, wasn't it?

11 A.   At that point, sir, as it was nearing my driver

12 side I feared for a second that it was trying to get

13 around my squad car, which is why I yelled "stop" as

14 I'm exiting.

15 Q.   The second time that you said that it is trying

16 to take off, you believed that it was trying to go

17 around you?

18 A.   At first, yes, I did, sir.

19        MR. ALVARADO:  Can you continue playing?

20        (Playing video.)

21        MR. ALVARADO:  Stop it.

22 BY MR. ALVARADO:

23 Q.   That's the second time when you said, "It's

24 trying to take off," right?

25 A.   That's correct, sir, yes.

Q.   Isn't that about one second before it actually
stopped its forward progress?

A.   Yes, sir.

Q.   You weren't trying to convey to officers that
this car was fleeing the scene, were you, because --

A.   I believed it was trying to drive around my
squad car, yes.

Q.   You were trying to convey that impression to
other officers --

A.   Yes.

Q.   -- and the dispatcher --

A.   Yes, I was.

Q.   That this car was trying to flee?

A.   Initially that's what I believed, yes, sir.
With the proximity of his vehicle to my vehicle, I
believed that he was attempting to continue to go
around me despite my overhead lights and spotlight.

Q.   And in spite of the fact that it was slowing
down and you could clearly see that.

A.   Yes, I could see that it was slowing, yes, sir.

Q.   In fact you could see that his brakes were
causing the back end of the car to dip down as the
brakes were --

A.   That I don't recall seeing.

Q.   But nevertheless, you know that it was slowing

1 down and coming to a stop one second after you said

2 "it's trying to take off," right?

3 A.   Yes, sir.

4 Q.   Is it common practice that when you say "car's

5 trying to take off," that you're trying to tell

6 other officers that this is a potentially dangerous

7 car who is fleeing and alluding a police officer?

8 A.   I'm attempting to alert that I believe this

9 vehicle is trying to get away from me, yes.

10 Q.   And at that point when it stopped its forward

11 progress, you've considered that vehicle -- at least

12 you were intending to control it at that point --

13 you believed that you had seized that vehicle.

14 A.   As far as I had seized it?

15 Q.   You had stopped its forward progress.

16 A.   Yes, it had stopped.

17 Q.   Now at that point when you stopped that car, the

18 only thing that you knew was that there were two

19 rounds fired at 2203 North Ellis from your

20 ShotSpotter display.  A little bit later on you

21 learned through your dispatcher that there was

22 another two rounds, but you didn't confirm that

23 through the ShotSpotter display in your car, right?

24 A.   Correct.

25 Q.   And then you learned that "Cars are en route to

Ellis.  There are several cars leaving, last seen
going northbound on McClure.  Then you received the
second message, "Cars en route Ellis.  There is also
a black male on foot who ran northbound towards
McClure.  I'm taking a call on this as well."

A.   Yes, sir.

Q.   That is the sum total of information that you
possessed that made you stop that car.

A.   Yes, sir.

Q.   Is that right?

A.   Yes, that's correct.

Q.   But at no time prior to you putting on your
overhead lights and stopping that vehicle, did you
try to clarify from the dispatcher as to how a
vehicle -- vehicles could be going northbound on
McClure?

A.   No, sir.

Q.   Even though you had come from the east of
McClure and you didn't see any vehicle.

A.   That's correct.

Q.   Is there some reason why you didn't do that?

A.   I couldn't tell you what my thought process was
at that time, sir.  I don't know why I wouldn't have
clarified it.

Q.   You had no information about any description of

1  the vehicle or vehicles leaving 2203 North Ellis
2  after the ShotSpotter call came in, did you?
3  A.   No, sir.
4  Q.   You had no idea how many people, if any, were in
5  these vehicles that were going northbound on McClure
6  according to your dispatcher; is that right?
7  A.   That's correct.
8  Q.   You did not know the make, model or color of
9  these cars?
10 A.   No, I did not.
11 Q.   You had no idea whether a person who had done
12 any shooting was in one of those vehicles, right?
13 A.   No, sir, I didn't.
14 Q.   You didn't even know if there was a weapon in
15 one of the vehicles that was supposedly leaving on
16 McClure.
17 A.   No, that's correct.
18 Q.   And you had no idea of the race of the
19 individuals who were in the vehicles that were
20 supposedly northbound on McClure.
21 A.   No, sir, I didn't.
22 Q.   The only thing you knew was that there was one
23 black male running on foot.
24 A.   That's correct.
25 Q.   You didn't even know if there was anybody in

1 those vehicles who had been shot.

2 A.   No, I did not.

3 Q.   And you had no information that had anyone had

4 in fact been shot until after the stop of that car,

5 and then you learned that Rickmon had been shot.

6 A.   Excuse me.  That's correct.

7 Q.   But yet you stopped that car.

8 A.   Yes, I did.

9 Q.   Even though three-and-a-half minutes passed --

10 well, actually, to be fair, it was less than

11 three-and-a-half minutes before you learned that

12 there were cars going northbound on McClure;

13 something less than three-and-a-half minutes -- well

14 let me -- strike that.  Let me take that back.

15       There has been testimony that from 2203

16 North Ellis to 2222 Ellis where you stopped this

17 vehicle approximately -- it is approximately 276

18 feet from those two locations.

19 A.   Yes, sir.

20 Q.   And Ellis, from the dead end on Ellis to Archer,

21 it's really a pretty short street overall, isn't it?

22 A.   I believe so, yes, sir.

23 Q.   And because it's a dead end, you knew that any

24 cars had to come from -- had to come northbound on

25 Ellis.

A.   That's correct, yes, sir.

Q.   For people could run on foot off in between houses and so forth, the cars had to come northbound.

A.   That's correct.

Q.   And you learned sometime short of three-and-a-half minutes that these cars were already on McClure, right?

A.   Yes.

Q.   And you knowing Ellis Street so well, you would know it doesn't take three-and-a-half minutes to get from even the end of Ellis past Archer or even McClure.

A.   That's correct.

Q.   Especially if these cars are fleeing some type of a shooting incident, it would take far less than three-and-a-half minutes to do that, right?

A.   That's correct.

Q.   And yet you stopped this car that apparently was pulling out from the left side of Ellis and approached you in a slow manner towards you, right?

A.   That's correct.

Q.   It never appeared to be going at any high rate of speed, did it?

A.   No, sir.

Q.   It was going well under the speed limit for
Ellis Street, wasn't it?

A.   It appeared so.

Q.   You testified that when you stopped the car, the
people inside were pointing back and saying words to
the effect of that there is people back there.

A.   That's correct, sir.

Q.   Pointing towards 2203 North Ellis, right?

A.   Pointing back towards the dead end, yes, sir.

Q.   At one point did you first notice people
congregating, milling about 2203 Ellis?

A.   It would have been very shortly after.

Q.   You didn't see those people when you're driving
down Ellis?

A.   No, sir, I didn't.

Q.   Did you see anyone on Ellis prior -- from when
you passed Archer, did you see anyone on the street
or off to the side of the street until after you
stopped the car?

A.   I don't recall seeing anyone, no, sir.

Q.   And by the way, since you know the 2200 block of
Ellis so well, you know that 2203 would be on the
right side as you were coming down.

A.   I do, on the left side of the street.

Q.   And this vehicle that you saw was coming from

1  the left side of Ellis?

2  A.    That's correct.

3  Q.    And appeared to -- in fact, you don't really

4  know exactly how far down along that block that the

5  car turned onto Ellis from.

6  A.    No.  I don't know how it would have turned

7  around, whether it backed into or turned into a

8  driveway to get situated back north.

9  Q.    You're speculating about that, aren't you?

10  A.    No, I'm saying I have no idea, sir.  I couldn't

11  tell you what the vehicle's actions were or what it

12  would have taken.

13  Q.    Right.

14  A.    I just only know that it appeared to be turning

15  right or northbound back towards me.

16  Q.    Right.  You could see that.

17  A.    Yes, sir.

18  Q.    Right.  And prior to the car coming to the end

19  of its forward progress, you couldn't tell or could

20  you tell how many people were in the car?

21  A.    At this point, yes, I was able to see that there

22  were three occupants.

23  Q.    Basically at the time the car stopped.

24  A.    Yes, sir.

25  Q.    That's when you noticed there were three people

1 in the car.

2 A.   Probably very shortly beforehand.  It was as

3 they were close enough my spotlight was able to

4 illuminate the interior of the car.

5 Q.   Then you observed they were three

6 African-American people.

7 A.   Yes.

8 Q.   Now you testified after you stopped the vehicle,

9 that the car began to go a little bit backwards?

10 A.   Yes, sir.

11 Q.   And that the driver's hand or hands was outside

12 of the vehicle and pointing to the back --

13 A.   Yes, sir.

14 Q.   -- towards the south of Ellis Street?

15 A.   Yes, sir.

16 Q.   You didn't take that as a threatening gesture

17 towards you, did you?

18 A.   No, sir.

19 Q.   And you're not saying here that you saw any kind

20 of movements inside the vehicle that would indicate

21 to you that somebody is trying to hide something

22 like a weapon?

23 A.   No.

24 Q.   You're not saying that, are you?

25 A.   No, sir.  There was a lot of hand movements but

they all appeared to be up where I could see them.
They were complying.
Q.   And it would be natural for anybody in that
situation if gunshots had been fired to be excited
under those circumstances.
A.   Absolutely, yes, sir.
Q.   Especially when a Peoria police officer is
walking up to them with his gun out, right?
A.   I would assume so, yes, sir.
Q.   I mean you would acknowledge that it is not
unusual for African-American people in the city of
Peoria to feel a little bit uncomfortable and get a
little excited when a Peoria police officer starts
walking up to them with a drawn gun, right?
A.   I wouldn't be able to tell you what people
think, but I understand that feeling, yes, sir.
Q.   You know that Peoria police officers have shot
at least two African-American people to death in the
last year or so.
A.   I'm aware of that, yes, sir.
        MR. HANNA:  Your Honor, I don't know where
we are going with this.  It is supposed to be --
        THE COURT:  Well, the question has been
asked and answered.  Let's see where we go.
        MR. ALVARADO:  Could you queue up the tape

1  at 30 seconds and then play it forward?

2  BY MR. ALVARADO:

3  Q.   Officer, I'm going to show you the video again

4  from approximately 30 seconds into this and forward,

5  and then I'm going to ask you some questions about

6  it, okay?

7  A.   Yes, sir.

8        (Playing video.)

9        MR. ALVARADO:  Okay.  Stop.

10  BY MR. ALVARADO:

11  Q.   And just to make it clear, I'm not sure if I

12  asked you this question, but when you said "trying

13  to take off" that second time, the car stopped, was

14  stopping and did stop.

15  A.   It was right up in my front bumper, yes, sir.

16  Q.   And wouldn't it be natural for the car to back

17  off of your front bumper because it was so close,

18  the cars were so close?

19  A.   I would hope that they wouldn't get that close

20  to begin with, which is why I made my radio traffic

21  -- that's fine, that's what I wanted -- I wanted

22  them to stop where they were; they had backed up.

23  Q.   Right.  And he backed up a little bit to get --

24  A.   Yes, sir.

25  Q.   -- a little bit away from your squad car.

1  A.   Yes, he did.

2  Q.   Nothing particularly unusual about that, right?

3  A.   No, sir.

4  Q.   But nevertheless you think they are trying to

5  get away from you when that car was backing up and

6  for that little brief --

7  A.   Not once he was backing up, no, sir.

8  Q.   Okay.  So the only point where you say it was

9  trying to take off was when it was coming towards

10 you?

11 A.   Yes, near my driver's front bumper there.

12        MR. ALVARADO:  Could I have just a moment,

13 Judge?

14 BY MR. ALVARADO:

15 Q.   Officer Ellefritz, when you turned from McClure

16 onto Ellis and began approaching 2203 Ellis --

17 A.   Yes, sir.

18 Q.   -- wasn't it your intention to stop any vehicle

19 you saw coming towards you based on what you --

20 A.   At that point, yes, I would have stopped a

21 vehicle in that general area.

22 Q.   Whether it contained a shooter, a victim, a

23 witness, or even just an innocent --

24 A.   I'm sorry.

25 Q.   -- or an innocent person who had no knowledge of

any of the events; you intended to stop any vehicle
that came northbound on Ellis towards you?

A.    Yes, sir.  I have no knowledge of who would have
been inside the car at that point.

Q.    So if someone had dropped, just dropped off a
person from leaving a 4:00 club closing and was
going home themselves, you were going to stop that
car, right?

A.    In that area, yes, sir.

Q.    Or if a Peoria Journal Star person was
delivering papers to the 2200 block of Ellis and was
just trying to leave Ellis, you were going to stop
them, right?

A.    I would have had no way of knowing, so, yes,
sir, I would have.

Q.    Or if it was somebody going to an early mass,
you were going to stop that car, right?

A.    Yes, sir.

Q.    And you had no idea whether the occupants of the
vehicle had done anything unlawful or were victims
of anything unlawful at that point.

A.    I have no way of knowing that, sir, at that
point, no.

        MR. ALVARADO:  Your Honor, I have nothing
further.

1                    (End of excerpt)

2                         *****

3

4        I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9    s/Nancy Mersot          Date:  January 11, 2018

10   Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25