1          UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF ILLINOIS
2                PEORIA DIVISION

3
   UNITED STATES OF AMERICA,    )  Docket No. 18-CR-10046
4                               )
         Plaintiff,             )
5   vs.                         )
                                )    December 21, 2018
6   TERRILL A. RICKMON, SR.,    )
                                )
7         Defendant.            )
   _____)
8

9             RECORD OF PROCEEDINGS
               MOTION TO SUPPRESS
10     BEFORE THE HONORABLE JAMES E. SHADID
           UNITED STATES DISTRICT JUDGE
11

12             THE APPEARANCES

13          RONALD LEN HANNA, ESQ.
            DOUGLAS McMEYER, ESQ.
14         Assistant U.S. Attorney
        One Technology Plaza, Suite 400
15          211 Fulton Street
              Peoria, IL  61602
16        On behalf of the Plaintiff

17
            ROBERT ALVARADO, ESQ.
18          Federal Public Defender
        401 Main Street, Suite 1500
19            Peoria, IL  61602
          On behalf of the Defendant
20

21

22
            Nancy Mersot, CSR, RPR
23     United States District Court Reporter
            100 N.E. Monroe Street
24            Peoria, IL  61602

25  Proceedings recorded by mechanical stenography,
    transcript produced by computer-aided transcription.

INDEX

GOVERNMENT'S WITNESSES:                    Page

       TRAVIS ELLEFRITZ

Direct Examination                          5

Cross-Examination                          33

Redirect Examination                       69

       SHAWN WETZEL

Direct Examination                         71

Cross-Examination                          94

1          (Proceedings were held in open court.)

2          THE COURT:  Okay.  Good morning, everybody.

3          This is the *United States v. Terrill*

4 *Rickmon, Sr.*, 18-10046.

5          Mr. Rickmon is present with Mr. Alvarado.

6          Mr. Hanna and Mr. McMeyer present for the

7 government.

8          This matter is set today on a hearing on a

9 Motion to Suppress evidence.  There is Document 20,

10 the Motion to Suppress filed by Mr. Rickmon.

11 Document 24, the government's response.  There is a

12 memorandum of law in support filed by the defense,

13 Document Number 26.

14          Are the parties ready to proceed?

15          MR. HANNA:  Yes, Your Honor.

16          MR. ALVARADO:  We are ready.

17          THE COURT:  Okay.  Let's proceed.

18          Anybody want to make any statements first or

19 go right to evidence?

20          MR. HANNA:  Judge, I would like to give you

21 a brief outline.

22          THE COURT:  All right.

23          MR. HANNA:  Also note that Docket Entry

24 Number 25, the government earlier this week filed an

25 exhibit list for the hearing today.  We added --

1    THE COURT:  Got it.

2    MR. HANNA:  There are a lot of exhibits on

3 audio recordings, and the response that we filed

4 indicated we would have four persons testifying and

5 there should only be two today.  So we expect

6 Officer Ellefritz who conducted the traffic stop.

7 And then Lieutenant Wetzel who was gathering

8 information about dispatch and records will be

9 testifying as well.

10    The other two officers will not be here to

11 testify today.  I don't think it is necessary.  The

12 issue at the time that we put them on the list was

13 we were concerned about establishing the order of

14 arrival by officers in this case because there is a

15 number of different ways to track that.  We have

16 found that the most reliable way to just establish

17 the order of arrival was by audio or -- it's an AVL

18 MapForce system, which is basically GPS data that

19 Officer Wetzel or Agent Wetzel gathered for us to

20 show the order based on GPS on how the officers

21 arrived.  And we also have a number of audio

22 recordings and the video itself that will establish

23 that.  So the other two officers are not necessary,

24 Your Honor.

25    THE COURT:  Okay.

1    MR. HANNA:  The first witness -- I didn't

2  know if Mr. --

3    THE COURT:  Mr. Alvarado, do you want to say

4  anything before we --

5    MR. ALVARADO:  Well, we agreed that none of

6  the other officers are necessary to decide the issue

7  here, which is whether there was reasonable

8  suspicion for the stop.  It will be based on Officer

9  Ellefritz and there is a second officer, I believe,

10  that the government is going to call.  But he is

11  just basically going to demonstrate to the Court

12  that the other officers arrived after the stop to

13  make it crystal clear that Officer Ellefritz is the

14  main officer.

15    THE COURT:  Very good.

16    (Witness sworn.)

17    THE CLERK:  Please be seated.

18    THE COURT:  Go ahead, Mr. Hanna.

19            TRAVIS ELLEFRITZ,

20  after having been duly sworn, testified as follows:

21            DIRECT EXAMINATION

22  BY MR. HANNA:

23  Q.   Will you please introduce yourself.

24  A.   Travis Ellefritz.

25  Q.   And where are you employed, Mr. Ellefritz?

1  A.   I am an officer with Peoria Police Department.

2  Q.   And what capacity or what are your duties as an

3  officer?

4  A.   I'm a third shift patrol officer.

5  Q.   How long have you been with the PPD?

6  A.   A little under five years.

7  Q.   And what are the hours of third shift?

8  A.   11:00 p.m. to 7:00 a.m.

9  Q.   How long have you been working that shift?

10 A.   Approximately four and a half years, a little

11 less than that maybe.

12 Q.   Okay.  And do you see in front of you an exhibit

13 marked Government's Exhibit Number 92?

14 A.   Yes, I do.

15 Q.   Have you seen this document before?

16 A.   Yes, I have.

17 Q.   Can you tell me what this is?

18 A.   This is a map of the police districts for the

19 City of Peoria.

20 Q.   Okay.  And have you been assigned over a

21 significant period of time to a particular district

22 in Peoria?

23 A.   Yes, I have, District 10.

24 Q.   Okay.  And do you see that there on the map?

25 A.   I do.

Q.   And can you tell us about the bordering streets
to the east and west on that District 10?

A.   Sure.  My eastern boundary would be Prospect,
and my western boundary is Knoxville.

Q.   And are you given, when you were assigned to
that district, a specific call sign or an
identification for your patrol car?

A.   Yes, I am.

Q.   What is that?

A.   3-Adam-10.

     MR. ALVARADO:  Your Honor, could Officer
Ellefritz pull the microphone a little bit closer?

     THE WITNESS:  I'm sorry, yes.

BY MR. HANNA:

Q.   When you were working your third shift duties,
how long had you been assigned to District 10 -- I'm
sorry if I asked that already.

A.   Approximately two years.

Q.   And when you're working that shift of 11:00 to
7:00 a.m. in District 10, are you typically the only
vehicle that is assigned to that district?

A.   There is another car that will be assigned
during our fourth shift, from 8:30 p.m. to 4:30 a.m.

Q.   Do you have a recollection of July 29th of this
year, 2018, being on duty?

1 A.   Yes, I do.

2 Q.   And do you know whether there was another car

3 assigned to District 10 on that date?

4 A.   There would not have been at that point.

5 Q.   Were there other cars assigned to the various

6 neighboring districts such as 11, 12?

7 A.   I don't recall there being a car assigned to 11.

8 There was a car in 5, and 13, and 3, I believe.

9 Q.   And do your duties in being assigned to District

10 10, include responding to gunfire or other incidents

11 in neighboring districts?

12 A.   Yes, they do.

13       MR. HANNA:  Your Honor, if I could have a

14 minute here.  This is the way it always works.  As

15 soon as we started this hearing, my computer

16 shutdown, so if I could have a moment to reboot.

17       THE COURT:  Take your time.

18 BY MR. HANNA:

19 Q.   On July 29, 2018, did you receive a notice of

20 gunfire?

21 A.   Yes, I did.

22 Q.   And how do you receive that alert?

23 A.   It's through a ShotSpotter program.

24 Q.   And can you generally explain what ShotSpotter

25 is in your capacity as an officer, your

1 understanding?

2 A.  Yes, it is a separate screen that we will have

3 up on our computers in our squad cars.  It alerts

4 when -- I believe, they are like triangulation that

5 identifies gunfire based on audio and sends an alert

6 to the officer's squad cars as well as our dispatch

7 center.

8 Q.  On July 29th, were you alone in your patrol car

9 when you were on duty?

10 A.  Yes, I was.

11 Q.  In your patrol car were you in uniform as well?

12 A.  Yes, I was.

13 Q.  Is your vehicle marked as well on that date?

14 A.  Yes, it was.

15 Q.  With Peoria Police Department markings?

16 A.  Yes.

17 Q.  And you have a computer that is inside of your

18 vehicle?

19 A.  Yes, I do.

20 Q.  Okay.  And what is the purpose of that computer?

21 A.  There will be -- there is a map somewhat similar

22 to this.  There is a CAD screen, which shows me my

23 dispatch calls, addresses and notes from the

24 dispatcher.  I can write reports.  There is the

25 ShotSpotter system in there as well.

1  Q.   And when you were on duty and awaiting the call,
2  that ShotSpotter alert comes through, can you
3  explain what you observe on your screen?
4  A.   If the ShotSpotter screen is not up, a small
5  screen will appear in the corner of my computer and
6  it makes a chiming noise.  And if I click that
7  button, it will bring the ShotSpotter screen itself
8  with an address, an audio, and a map.
9  Q.   And what other information do you receive when
10 gunfire is expelled?
11 A.   Through ShotSpotter?
12 Q.   Yes.
13 A.   Like I said, it will give a map like a Google
14 Earth image, total number of rounds fired; there is
15 an option to go listen to it, and an address.  I
16 believe that's it.
17 Q.   And do you receive on July 29th of 2018, in
18 addition to ShotSpotter, a notification of that
19 gunfire in any other way?
20 A.   Through my dispatch.
21 Q.   And what manner is that transferred through?
22 A.   Through a radio.
23 Q.   You mentioned a CAD system, is that Computer
24 Assisted Dispatch?
25 A.   Yes.

Q.   Is that also something that is on your screen in
front of you?

A.   Yes.  It will pop up once they start dispatching
me, they are typing that screen to create it for me
as well.

Q.   And on July 29th when you received the
ShotSpotter notification, ShotSpotter, where were
you located?

A.   I was near the intersection of Abington and
Perry.

     MR. ALVARADO:  I'm sorry, Judge, I couldn't
hear.

     THE WITNESS:  Abington and Perry.

     MR. ALVARADO:  Okay.

BY MR. HANNA:

Q.   Is that near the old Woodruff High School?

A.   Yes, it is.

Q.   Did your squad car have a dash cam installed in
it and operating on that night, that morning rather?

A.   Yes, it did.

Q.   Okay.  And how did you respond to the
ShotSpotter alert?

A.   Once I received the alert, I began to drive
to -- would you like my route, is that what you are
asking, sir?

1  Q.   Just how you responded so you can take us.  Step
2  us through it.
3  A.   Sure.  Once the ShotSpotter alert comes up, I
4  will look at the address.  I will recognize that it
5  is an area close to me, and then I begin to drive to
6  that.  I will put myself en route.
7  Q.   Do you put yourself en route before receiving
8  any additional information?
9  A.   Sometimes, it just depends.
10 Q.   Okay.  On this occasion, July 29th, do you have
11 a recollection of whether you responded just
12 immediately to the ShotSpotter?
13 A.   I believe I began driving, but I don't recall
14 whether dispatch had notified me or not prior to me
15 starting to move, or I don't know if I heard
16 anything on the radio.
17 Q.   And as you are en route, did you receive
18 additional information from dispatch?
19 A.   Yes, I did.
20 Q.   What form was that received?
21 A.   Through my radio, and they would have put notes
22 on my CAD screen, but I would have been listening to
23 the radio as I was driving.
24      MR. HANNA:  Okay.  Can we switch to the
25 video please?

BY MR. HANNA:

Q.   If you would, Officer Ellefritz, could you give us the general route that you took to the scene?

A.   I would have driven northwest on Abington, north on Prospect, turned west on McClure crossing Knoxville, and then turned south on Ellis.

Q.   And is Ellis in District 11?

A.   Yes, it is.

Q.   Were you the first vehicle or patrol car to respond to that scene?

A.   Yes, I was.

Q.   And what was the specific address that you were responding to?

A.   2203.

Q.   Okay.  And was your dash cam recording at that time?

A.   It was as I arrived, yes.

Q.   Did you review the dash cam video prior to coming into court today?

A.   I did, yes.

Q.   Do you see what's on your screen there?

A.   Yes, I do.

Q.   This is labeled Government Exhibit Number 7.

     What is this?

A.   I'm sorry?

Q.   Can you tell me what this is, that you see in
front of you, Government's Exhibit Number 7?

A.   This would be my dash cam footage.

Q.   Okay.  Can you describe what we are seeing here?

A.   Sure.  It would be the -- it would be the camera
that is situated in front of my car, and I believe
that that is me driving westbound on McClure.

        MR. HANNA:  Your Honor, may I have
permission to play this video?

        THE COURT:  Mr. Alvarado, wish to be heard?

        MR. ALVARADO:  Your Honor, I have no
objection, but could the government put the cursor
back to zero seconds so we get the full video?

        THE COURT:  There you go.

        MR. HANNA:  It's now back to zero.

        THE COURT:  Go ahead.

        MR. HANNA:  I'm going to play this through
for a couple minutes, Your Honor.

        (Playing video.)

        MR. HANNA:  Okay.  Stop the video at two
minutes and nine seconds.

BY MR. HANNA:

Q.   Do you recognize this video as a dash cam video
from the traffic stop on June 29th?

A.   Yes, I do.

1  Q.   And I'm going to switch over to another exhibit
2  briefly here, Government's Exhibit Number 3.
3        Do you recognize the specific location of
4  that traffic stop?
5  A.   Yes, I do.
6  Q.   And the address.  What is the significance of
7  what I have on a map in front of you?
8  A.   The video stopped in front of 2222 North Ellis.
9  Q.   Okay.  So, if you could just describe to the
10 Court on this map, your entry into the area from the
11 direction of the cam?
12 A.   Absolutely.  I would be driving westbound on
13 McClure, which would be on the right from the paper
14 here turning south or turning left to the bottom of
15 the sheet onto Ellis which is a dead end road
16 crossing over Archer.
17 Q.   And again the red mark is where on the video you
18 would have stopped the white vehicle, correct?
19 A.   Yes.
20 Q.   I show you second page of Exhibit Number 3.
21       Do you recognize that?
22 A.   Yes, I do.
23 Q.   And again, what is it that you see in this
24 picture?
25 A.   2203 North Ellis as indicated in the bottom

which is where the ShotSpotter was.

Q.   Do you see the other address that's on there?

A.   Yes.

Q.   What is that?

A.   2222 North Ellis.

Q.   Did these two addresses represent the, number
one, 2203 North Ellis where the ShotSpotter
indicated where the shots were fired; and then, two,
the address where you stopped the vehicle?

A.   That's correct.

Q.   Does this appear to be an accurate depiction,
layout of the neighborhood here?

A.   Yes, it does.

Q.   Have you responded to this area for reports of
gunfire before?

A.   I have.

Q.   How often were you traveling over, roughly, into
District 11 to respond to reports of crime in this
general area?

A.   Within a couple block radius, I would say, maybe
once a night, maybe, at most, so....

Q.   When you began to travel south on North Ellis
Street, were you aware at that time that that was a
dead end street?

A.   I was, yes.

```
 1  Q.   Had you been down that street before?
 2  A.   Yes, I have.
 3  Q.   Okay.  And again how many houses roughly would
 4  the traffic stop that you conducted be from the
 5  address where the shots were reported fired?
 6  A.   Appears approximately about six to seven houses
 7  away.
 8  Q.   In addition to ShotSpotter, were you also
 9  receiving information from dispatch while you were
10  en route to 2203 Ellis?
11  A.   Yes, yes, I was.
12  Q.   And have you had an opportunity to review --
13          MR. HANNA:  Mr. Clerk, if you could pull up
14  that computer screen again, please.
15  BY MR. HANNA:
16  Q.   Have you had an opportunity prior to coming into
17  court today to listen to the dispatch that took
18  place between yourself and other officers and the
19  City of Peoria's dispatch on this incident of
20  July 29th.
21  A.   Yes, I did.
22  Q.   And did it appear to be an accurate recording of
23  that communication?
24  A.   It appeared so, yes.
25          MR. HANNA:  Mr. Clerk, are we able to show
```

what is on the ELMO overhead at the same time as
playing audio?  If you could show the ELMO real
briefly?
BY MR. HANNA:
Q.   Do you recognize this, Government's Exhibit
Number 5?
A.   Yes, I do.
Q.   Did you have an opportunity to -- or what is
this?
A.   This is a printout of radio traffic from this
incident.
Q.   Okay.  So this is a transcript of the audio from
dispatch and the other officers responding?
A.   Yes.
Q.   Does it appear to be accurate and consistent
with what's on the audio recording?
A.   It appears so, yes.
         MR. HANNA:  I provided defense counsel with
a copy of this in advance of the hearing, Your
Honor.
         May I approach, Your Honor?
         THE COURT:  You may.
BY MR. HANNA:
Q.   I'm going to hand you a copy of Government's
Exhibit Number 5, which is a transcript that I am

1  referring to that will correspond with the audio

2  from the uncompressed dispatch.

3        MR. HANNA:  Permission to play Exhibit 4,

4  uncompressed dispatch.

5        THE COURT:  Go ahead.

6        (Playing audio.)

7        MR. HANNA:  For the record, I'm going to

8  move this forward to the time of this content that

9  is relevant.  Starts at approximately 1:50 on the

10  timer.  I'm going to start it at 1:46.

11        (Playing audio.)

12  BY MR. HANNA:

13  Q.  Officer Ellefritz, did you just hear what was

14  said by dispatch at that point in time?

15  A.  Yes.

16  Q.  What was your understanding of that

17  communication?

18  A.  ShotSpotter information at 2203 North Ellis, two

19  rounds fired.

20        (Playing audio.)

21  BY MR. HANNA:

22  Q.  Stopping the video time at 2:23.

23        Did you hear that as well?

24  A.  I did.

25  Q.  What was your understanding --

1  A.   A second -- I'm sorry.

2  Q.   Go ahead.

3  A.   A second ShotSpotter activation at the same

4  location for two more rounds.

5         (Playing audio.)

6  BY MR. HANNA:

7  Q.   Did you hear that?

8  A.   Yes.

9  Q.   I'm stopping at 2:26.

10        What did you hear?

11  A.   I was acknowledging what she had told me.

12  Q.   Were you en route at that point in time?

13  A.   Yes, I was.

14        MR. ALVARADO:  Your Honor, I wonder if there

15  is any way that the officer could move that

16  microphone a little bit closer.

17        THE WITNESS:  Yeah, I'm sorry.  Is that

18  better?

19        MR. ALVARADO:  That's better.

20        (Playing audio.)

21  BY MR. HANNA:

22  Q.   Did you hear that, Officer Ellefritz.

23  A.   Yes, I did.

24  Q.   When you were en route, did you hear that

25  communication come from dispatch?

1  A.   Yes, I did.

2        MR. HANNA:  For the record that was at 2:59

3  on the audio.

4        Your Honor, I'm going to drag this forward

5  being that there isn't anything for another period

6  of time to five -- sorry -- 45, I'm going to start

7  it.

8        (Playing audio.)

9  BY MR. HANNA:

10 Q.   Did you hear that Officer Ellefritz?

11 A.   Yes, I did.

12 Q.   And that's at 3:50 on the audio track time.

13       Was that communication conveyed to you in

14 the course of your response?

15 A.   Yes, it was.

16       MR. HANNA:  I'm going to move this forward

17 again to 5:08.

18       (Playing audio.)

19 BY MR. HANNA:

20 Q.   What did you hear there, officer?

21 A.   I was going 10-7, which means I'm arriving on

22 scene, and I'm advising dispatch and other officers

23 there is a car going north on Ellis.

24 Q.   And again, were you the first officer that was

25 arriving on scene?

A.   Yes, I was.

        (Playing audio.)

        MR. HANNA:  Noting that's around --- between 5:31 and 5:36 on the audio track time.

BY MR. HANNA:

Q.   What did you hear there?

A.   That's me putting out the license plate.

Q.   Where were you situated at that point in time?

A.   I was in the 2200 block of Ellis.  At that point I probably would have come to a stop.  I was starting to stop at 2222.

        (Playing audio.)

BY MR. HANNA:

Q.   And stopping at 6:12.

        Did you hear that?

A.   Yes, I did.

Q.   What was said?

A.   I'm putting out that there are three occupants in the vehicle and they were telling me that there are more people back at the ShotSpotter scene at 2203.

Q.   Which would have been further down?

A.   Further south of my location, yes.

        (Playing audio.)

BY MR. HANNA:

1  Q.   I'm going to stop the audio at 6:19.

2         Officer Ellefritz, based upon your

3  recollection and hearing this audio from the

4  dispatch, is it accurate to say that approximately

5  three and a half minutes passed from the time you

6  were dispatched until you stopped this vehicle on

7  Ellis Street?

8  A.   Yes.

9  Q.   Referring to Exhibit Number 7.

10         Do you recognize this?

11 A.   Yes, I do.

12 Q.   And this is your dash cam video?

13 A.   Yes.

14 Q.   I will walk you through this briefly.

15         (Playing video.)

16 BY MR. HANNA:

17 Q.   Stopping at five seconds, what do you observe in

18 this frame?

19 A.   Coming up on the intersection of Ellis with

20 McClure, I recognize the stoplight, and I believe

21 that that is Cooper's on Sheridan there.

22         MR. ALVARADO:  Your Honor, could the witness

23 keep his voice up?

24         THE COURT:  Are you able to?

25         THE WITNESS:  Yes.

1          THE COURT:  Thank you.

2    BY THE WITNESS:

3    A.   I was observing the stoplight at Sheridan and

4    McClure just in front of my squad car there a block

5    west of my location.  And I'm coming up on the

6    intersection with Ellis.

7    BY MR. HANNA:

8    Q.   Okay.  Do you see other vehicles in this frame?

9    A.   I don't believe so.  I see what appears to be

10   the red lights directly in front of me or maybe it

11   is a set of taillights.  I'm not sure to be honest

12   with you.

13   Q.   When you are traveling westbound on McClure, did

14   any vehicles pass you the other direction going

15   westbound?

16   A.   No, they did not.

17   Q.   Are your lights extinguished at this point in

18   time?

19   A.   They are, yes.

20   Q.   What's the purpose?

21   A.   It provides us with a little bit of concealment

22   as we approach an area.  It's standard practice for

23   us for most calls.

24          MR. HANNA:  Play the video again starting at

25   five seconds.

1          (Playing video.)

2   BY MR. HANNA:

3   Q.   At 12 seconds here, are you headed southbound on

4   North Ellis?

5   A.   Yes, I am.

6   Q.   Stopping the video at 18 seconds.

7          What happens here?

8   A.   I turn back on my headlights as I'm seeing a set

9   of headlights approaching me from the dead end.

10  Q.   Starting the video again.

11         (Playing video.)

12  BY MR. HANNA:

13  Q.   Stopping at 26 seconds.

14         What happens here?

15  A.   I'm activating my overhead emergency lights.

16  Q.   And what was your intention?  Why did you do

17  that?

18  A.   To stop the vehicle that was leaving the scene

19  of the ShotSpotter.

20  Q.   Were there any other vehicles traveling on North

21  Ellis at this time?

22  A.   No, there weren't.

23         (Playing video.)

24  BY MR. HANNA:

25  Q.   Stopping at 30 seconds.

1          What do you observe here?

2  A.   I turned on my spotlights to illuminate the

3  vehicle as well.

4  Q.   Did that illuminate the interior of that

5  vehicle?

6  A.   Yes, it did.

7  Q.   What did you observe at that time?

8  A.   I could see that there were three occupants

9  inside.

10  Q.   Okay.  And were you able to identify their race

11  at that time?

12  A.   Probably not at this point.  Probably as I got a

13  little bit closer, I would have been able to.

14          (Playing video.)

15  BY MR. HANNA:

16  Q.   Stopping at 36.

17          What did you just say there?

18  A.   I'm pulling up the license plate of the vehicle.

19  Q.   So this is consistent with what is in the audio

20  dispatch recordings?

21  A.   Yes.

22  Q.   I'm going to hit play again.

23          (Playing video.)

24  BY MR. HANNA:

25  Q.   And what did you say at about 41 seconds on this

1  video?
2  A.    I'm telling them to stop, stay where they are.
3  Q.    Did they comply?
4  A.    Yes.  The vehicle started rolling back, and I
5  was concerned it was either going to hit somebody or
6  attempt to take off, or drive around me.
7  Q.    Okay.  And what else do you observe in this
8  frame?
9  A.    I can see people's hands and head sticking out
10  of the side of the window, the side window, excuse
11  me.
12  Q.    Can you walk us through what you were observing
13  as you -- were you exiting the vehicle at that time?
14  A.    Yeah, I would have been.
15  Q.    What did you observe as you exited the vehicle?
16  A.    The occupants of the vehicle were yelling at me,
17  and I was trying to get to a point where I could see
18  a little bit better inside of the car and advise
19  dispatch what I was seeing.
20  Q.    And what were they yelling?
21  A.    I think at one point somebody yelled, "back
22  there," yelling "there is more people down there"
23  pointing backwards behind them or south of them.
24  Q.    What did you do there at 45 seconds?
25  A.    I'm approaching the vehicle to be able to see

them better.

Q.   Okay.  And what do you have in your right hand
there?

A.   I have my service weapon.

Q.   Okay.  And what do you have in your left hand?

A.   My flashlight.

Q.   What are you doing with your flashlight?

A.   Illuminating the car.

Q.   What are you doing with your firearm?

A.   I'm keeping it down by my side.

Q.   Are you giving the occupants commands?

A.   Yeah, I told them -- I believe I told them to
keep their hands up where I could see them.  And I
was trying to listen to what they were telling me.

Q.   Okay.  And what were they telling you?

A.   They were continuing to shout:  there were
people out there, there was more; the person that I
was looking for was behind them.

Q.   Okay.  At this point in time were you able to
look further down the street to see what they were
talking about?

A.   I was, yes.

Q.   What did you observe?

A.   There were more people down, farther down
towards the dead end.  They appeared to be all on

1  foot.

2  Q.   Approximately how many people?

3  A.   I recall maybe 15, 20, maybe.

4  Q.   Okay.  And the map that I showed you earlier,

5  does that appear to be consistent that it would be

6  maybe less than 300 feet down the street?

7  A.   Yes.

8  Q.   Okay.  And were you still the only officer at

9  the scene at this time?

10  A.   Yes, I was.

11  Q.   Okay.  What are you doing at this time?

12  A.   I'm trying to speak into my radio.

13  Q.   This is at 1:08 on the timer.  I stopped it.

14       I'm starting it again.

15       (Playing video.)

16  BY MR. HANNA:

17  Q.   And can you describe what the driver is doing

18  this entire time?

19  A.   He is waving his arms at me pointing backwards.

20  Q.   And what is he telling you?

21  A.   I don't recall what his exact words were, but he

22  was still yelling what he was telling me before,

23  that there were people behind him, there are people

24  back there.

25  Q.   Do you recall if he said anything about gunfire?

1  A.   I don't recall.

2  Q.   Stopping at 1:31.

3       What, if anything, about the occupants were

4  you able to observe at this point while you're

5  shining the flashlight?

6  A.   There is a lot of moving around, a lot of hand

7  waving, a lot of yelling.

8  Q.   Start it again.

9       (Playing video.)

10 BY MR. HANNA:

11 Q.   Okay.  Stopping at 1:38.

12      What do you observe here?

13 A.   Another officer arriving.

14 Q.   Okay.  If you recall which officer that is?

15 A.   I believe that's Officer Espinal.

16      (Playing video.)

17 BY MR. HANNA:

18 Q.   Stopping at 1:46.

19      What do you observe here?

20 A.   The passenger is getting out of the vehicle.

21 Q.   And did you then move yourself to the other

22 vehicle as well?

23 A.   Yes, I did.

24 Q.   Is Espinal over there as well?

25 A.   Yes, he is.

1  Q.   What did you observe at that time?

2  A.   The passenger had blood on his forehead.  He was

3  telling me that he had been shot or he had been hit.

4  Q.   Playing again.

5        (Playing video.)

6  BY MR. HANNA:

7  Q.   Okay.  Stopping the video at two minutes four

8  seconds.

9        What is happening in the left-hand frame

10 there?

11 A.   He is telling me that he has been hit and he is

12 trying to show me his injury.

13 Q.   What injury did he sustain?

14 A.   It was a gunshot wound, sorry.

15 Q.   Where was his gunshot wound?

16 A.   It was on his upper leg.

17 Q.   Stopping the video at 2:07.

18        After this interaction, were the passengers

19 on scene, all of the occupants interviewed in some

20 capacity?

21 A.   Yes, they were.

22 Q.   And was the driver the owner of the vehicle?

23 A.   Yes, he was.

24 Q.   Did he consent to a search of the vehicle?

25 A.   He did, yes.

1  Q.   And was there -- what, if anything, was located

2  under the seat where the front right-hand passenger

3  would have been seated?

4  A.   A firearm was located.

5  Q.   And the person that had been shot is showing the

6  wounds, is he here in court here today?

7  A.   Yes, he is.

8  Q.   Will you please point out something that he is

9  wearing?

10  A.   Black and white jumpsuit.

11  Q.   Do you know him from this investigation to be

12  Terrill Rickmon?

13  A.   I do.

14        MR. HANNA:  Okay.  Your Honor, I would move

15  for the admission of the exhibits, the two maps of

16  Ellis Street, which were Exhibit Number 3; the

17  dispatch recording, which was four; the dispatch

18  audio recording transcript which was 5; dash cam

19  video, Exhibit Number 7; and then 9-2, which was the

20  map of the City of Peoria's police districts.

21        THE COURT:  Any objection?

22        MR. ALVARADO:  No objection.

23        THE COURT:  It will be admitted.

24        MR. HANNA:  I'm going to minimize the screen

25  here, then I have no further questions.

1    THE COURT:  Mr. Alvarado.

2    MR. ALVARADO:  Just a moment, Judge.

3              CROSS-EXAMINATION

4  BY MR. ALVARADO:

5  Q.   Officer Ellefritz, you were working a different

6  district from the Ellis Street district, correct?

7  A.   Yes, sir.

8  Q.   You were down at Abington and Perry, which was

9  several miles from the 2200 block of Ellis, isn't

10 that true?

11 A.   Yes, sir.

12 Q.   You were the first officer to arrive on the

13 scene?

14 A.   I was.

15 Q.   Now, you had testified earlier that you had

16 worked that -- you had gone to that area before.

17 But had you ever been assigned to the district

18 involving North Ellis?

19 A.   I have been assigned there, yes.

20 Q.   And you said -- also said that you have

21 responded to ShotSpotter calls in that area?

22 A.   Shots fired calls, yes, sir.

23 Q.   Did you ever respond to ShotSpotter calls to the

24 2200 block of Ellis before?

25 A.   I don't recall specifically what ShotSpotter

1  would have responded to there, no.

2  Q.   So you have no independent memory of ever going

3  to the 2200 block of Ellis to respond to a call from

4  ShotSpotter that shots had been fired?

5  A.   Not necessarily ShotSpotter, initially, sir, no;

6  but I know that I have gone to shots fired calls

7  there, or someone may have called in shots fired,

8  but there may not have been an activation.

9  Q.   Okay.  On Ellis?

10  A.   Yes.

11  Q.   Now, did you -- have there been times in the

12  past when you responded to ShotSpotter calls

13  anywhere in the city --

14  A.   Sure.

15  Q.   -- where you had not discovered independent

16  evidence that shots had been fired?

17  A.   Yes, yes.

18  Q.   Are you aware that -- actually, there are no

19  statistics for the Peoria Police Department as to

20  the number of false positives or false negatives

21  that the ShotSpotter system provides to the police.

22  A.   I would have no knowledge of that, sir.

23  Q.   But you were aware that ShotSpotter is not a

24  hundred percent accurate tool that Peoria police

25  use.

A.   Okay.  If that's what you're telling me, yes,
sir.
Q.   And I assume you're also told not to completely
rely on ShotSpotter to indicate that gunshots were
fired at any particular location.
A.   That's correct.
Q.   Nevertheless, you received an indication that
shots had been fired at 2203 North Ellis --
A.   Yes.
Q.   -- from two different sources, correct?
A.   Yes.
Q.   The first source was the display that showed
from ShotSpotter that two shots had been fired at
2203 North Ellis.
A.   That's correct.
Q.   And you get that -- there is, I think, if I
understand this right -- you have a separate monitor
in your squad car that would automatically open up?
A.   It's the same computer screen, but, yes, a
separate -- a small bar would activate that would
pop up.  And once I click on that, it would bring up
the ShotSpotter screen itself.
Q.   I think you also said that you received an
audio.  As part of that alert, there is an audio
component to that?

A. It makes like a ringing or a chiming noise to
alert me.

Q. Okay. So it is not that you are actually
hearing the sounds that were being recorded to you?

A. No.

Q. Although ShotSpotter does have that capability
so you can hear what ShotSpotter is supposedly
reporting.

A. That's correct, yes.

Q. So when you received the ShotSpotter call of two
rounds at 2203 Ellis, you immediately started going
towards that area?

A. Yes, I did.

Q. By the way, what were you doing at the time that
you received that alert?

A. I was in my squad car. I don't recall
specifically what I would have been doing.

Q. Okay. Were you moving or were you sitting?

A. I believe I had just pulled up.

Q. I'm sorry?

A. I believe I just pulled up to that location. So
I'm sure that I probably --

Q. To Abington and Perry?

A. Yes.

Q. So you were on the street at Abington and Perry.

1 A.   I don't recall my exact location, sir.  I just
2 know the map showed me as near that intersection.
3 As far as a parking lot or a street or a sidewalk, I
4 couldn't tell you that; I don't recall.
5 Q.   Okay.  Now you generally worked third shift; is
6 that right?
7 A.   That's correct.
8 Q.   So that's basically 11 to what time in the
9 morning?
10 A.   11:00 p.m. to 7:00 a.m.
11 Q.   So I assume then you're well aware that if a
12 particular tavern has a club license, that those
13 clubs close at 4:00 in the morning.
14 A.   Yes.
15 Q.   And you were responding to this shot call at
16 approximately 4:30.
17 A.   Yes.
18 Q.   And regular bars close at 2:00 a.m., correct?
19 A.   Yes, I believe.
20 Q.   And I would assume, based on your experience
21 working that third shift, that you notice an
22 increase in traffic after 4:00 in the morning when
23 everyone is leaving the clubs.
24 A.   Sure, that's correct.
25 Q.   And you can see traffic at any part of the

1  city --

2  A.   Yes.

3  Q.   -- after 4:00 in the morning.

4  A.   Yes.

5  Q.   And by the way, July 29th, when this incident

6  occurred, do you recall the day of the week it was?

7  A.   I don't sir, no.

8  Q.   Okay.  So you started moving towards 2203 Ellis

9  when you got the ShotSpotter call.

10       Approximately, how long after that did you

11  receive the dispatcher call to head to that or

12  actually just to check if you were -- I assume that

13  it's just to check to see if you were available?

14  A.   I'm sorry?

15  Q.   Well, the dispatcher -- let's see.

16       At 1:50, according to Government's

17  Exhibit 5, the dispatcher said Adam-10, Adam-13.

18  A.   Yes.

19  Q.   They were just --

20  A.   They are calling us.

21  Q.   -- calling you?

22  A.   Yes.

23  Q.   Both cars?

24  A.   Yes.

25  Q.   Do you know where Adam-13 was at that time?

A.   I don't.

Q.   What car was assigned to the Ellis district that morning; do you know?

A.   There was no car assigned to that district at that point.

Q.   Why is that?

A.   I don't know, sir.  There just wasn't enough officers working that night to have an Adam-1 or a 3-Adam-11 that night.

Q.   How many Peoria Police Department patrol vehicles were working at approximately 4:30 in the morning?

A.   I don't know the answer to that, sir.

Q.   Okay.  So then the dispatcher also told you at -- exactly -- well, at exactly two minutes into the recording, that 2203 North Ellis showing two rounds; is that right?

A.   Yes.  Yes, sir.

Q.   Now you already knew that because you had seen your display.

A.   Yes.

Q.   And then you said at seven seconds later, Adam-10 10-4.

A.   Yes, sir.

Q.   You were just acknowledging that you received

1  that.

2  A.   I was acknowledging my dispatch call, yes.

3  Q.   When did you report that you were en route to

4  Ellis?

5  A.   I don't need to tell them that I'm en route.

6  Once they call me, and I acknowledge that call, I'm

7  en route to that call.

8  Q.   So you did not notify the dispatcher that you

9  were en route to that call, to 2203 Ellis?

10 A.   I'm afraid I don't understand you.  By me

11 acknowledging -- by me acknowledging Adam-10 10-4;

12 I'm telling them "I heard your call; I'm

13 responding."

14 Q.   So what you're saying is that you are assuming

15 the dispatcher knows that you are en route.

16 A.   That's our common practice, sir.  That's what

17 all officers do.  I don't need to acknowledge

18 Adam-10, specifically, I'm en route.  By me

19 acknowledging the call, then they know that I'm

20 responding.

21       MR. HANNA:  For clarification, I think

22 Mr. Alvarado is referring to two different parts of

23 the conversation between Officer Ellefritz and

24 dispatch.  If he could have the benefit of looking

25 at Government's Exhibit Number 5, I think that that

1  would clarify what he is referring to.

2        MR. ALVARADO:  I am referring to

3  Government's Exhibit 5.

4        MR. HANNA:  Can we show that to the witness

5  so he understands what you are referring to?

6        MR. ALVARADO:  Let me ask the witness --

7        THE COURT:  Let me ask this first, and I

8  know that you have asked him to put the microphone

9  closer to him.  I'm going to ask that he moves it

10  away a little bit and then speak up.  Thank you.

11        THE WITNESS:  Okay.

12        THE COURT:  Go ahead.  Ask first as to --

13  BY MR. ALVARADO:

14  Q.  Officer Ellefritz, do you understand what I'm

15  asking you about the dispatcher to -- the dispatcher

16  messages to you, your messages to the dispatcher?

17  A.   I thought I did, sir, but if I could look at it,

18  I think that might help me to be able to answer your

19  question better.

20        MR. ALVARADO:  Okay.  Do you have it?

21        MR. HANNA:  I do.

22  BY MR. ALVARADO:

23  Q.  Officer, I'm going to show you -- may I approach

24  the witness?

25        THE COURT:  You may.

BY MR. ALVARADO:

Q.   I'm going to show you Government's Exhibit 5.

A.   Okay.

Q.   I think it has already been admitted into
evidence.  Actually, you can follow along while I'm
asking you these questions.

A.   Absolutely, sir.

Q.   If you want.

        And does this refresh your memory about what
occurred that morning?

A.   Yes, it does.

Q.   Okay.  So after two minutes into the recording,
your dispatcher said 2203 North Ellis showing two
rounds.

A.   Yes, sir.

Q.   And then at seven seconds later, you said
Adam-10 10-4.

A.   That's correct.

Q.   Now you are saying that that's the common
practice that that means that you're en route to
Ellis?

A.   Yes, sir.  By them contacting me; first, I
acknowledge it; they then dispatch me to the call; I
acknowledge that I have received the call and am
responding.

1 Q. Adam-13 didn't respond at all.

2 A. I believe he said "Adam-13 en route." So he

3 acknowledged before he was dispatched to the call.

4 Q. Right. Why -- you say that it was a common

5 practice that you didn't need to indicate that you

6 were en route. Adam-13 did.

7 A. Dispatcher contacted him and he went ahead and

8 acknowledged "en route." He didn't need to hear the

9 dispatch. I prefer to hear the dispatch calls,

10 which is our common practice, and that's the way

11 that we were trained.

12 Q. Adam-13 didn't hear the call?

13 A. No, I'm saying he didn't need to hear the

14 dispatch call. He had already responded that he

15 understood. He had the same ShotSpotter screen that

16 I did.

17 Q. Well, take a look at the exhibit again because

18 I'm having a hard time understanding this.

19     The dispatcher said at 1:50, "Adam-10,

20 Adam-13."

21 A. Yes.

22 Q. At 1:53 you said, Adam-10, I'm here; basically.

23 Is what you are saying?

24 A. Yes, I acknowledge.

25 Q. At 1:56, Adam-13 said, "Adam-13 en route."

1   A.   Yes, he did.

2   Q.   And then at two minutes into the recording, the

3   dispatcher said, "2203 North Ellis showing two

4   rounds."

5   A.   Yes.

6   Q.   And then you said, "Adam-10 10-4."

7   A.   Yes.

8   Q.   And you say it is common practice that the

9   dispatcher knew that you were already en route to

10  Ellis.

11  A.   That by me acknowledging them, I would be

12  responding, yes.

13  Q.   But obviously Adam-13 didn't know that that's

14  common practice because he said that he was en

15  route.

16  A.   I'm afraid I can't testify to why he said what

17  he said.

18  Q.   Well, the common practice only seems to be a

19  practice with you and whoever this dispatcher was,

20  right?

21  A.   I believe it would be common practice with all

22  of us.  But why he didn't do it, I don't know, sir.

23  Q.   Okay.  Well, nevertheless, you started going

24  towards Ellis.

25  A.   Yes.

1  Q.   And I believe the testimony was that it took
2  about three and a half minutes to get there; is that
3  right?
4  A.   Yes, sir.
5  Q.   You received a dispatch as you were on your way
6  there.  At 2:59 in the recording, the dispatcher
7  said -- no, no -- back at 2:18, the dispatcher said,
8  "Getting a second one, same location.  Showing two
9  more rounds"; is that correct?  Did you hear that?
10 A.   Yes, I did.
11 Q.   And then at 2:24, you said, "Adam-10 10-4."
12 A.   Yes.
13 Q.   You were basically saying you acknowledge that?
14 A.   Yes.
15 Q.   And it was common practice for you and this
16 dispatcher; he already knew that you were on your
17 way there.
18 A.   Well, I'm sure he would have known about that,
19 yes.
20 Q.   How would he know that?
21 A.   Because I already acknowledged that I received
22 the call.
23 Q.   Okay.
24 A.   I'm sorry.  Maybe I'm not understanding what
25 you're asking, sir.

1  Q.   Okay.  Let me move on.  Let me move on.
2  A.   Okay.
3  Q.   Did you notice on your display panel that the
4  second ShotSpotter call had come in?
5  A.   I'm sure I would have, but I don't recall
6  specifically bringing up that screen as I was
7  driving.
8  Q.   But you have no independent recollection of
9  receiving that?
10 A.   I don't have an independent recollection of the
11 second screen chiming at me; no, I don't, sir.
12 Q.   Okay.  By the way, did you see other cars on
13 your way to Ellis?
14 A.   I don't recall other cars, no.
15 Q.   And then you received another message from the
16 dispatcher at 2:59.  And the dispatcher said, "Cars
17 en route to Ellis.  There are several cars leaving
18 but seen going northbound on McClure."
19 A.   Yes.
20 Q.   And meanwhile you're still heading towards
21 Ellis.
22 A.   Yes, sir.
23 Q.   Do you recall where you were when you received
24 that message?
25 A.   No, I don't, sir.

1  Q.   You don't know if you were already on McClure at
2  that time?
3  A.   I don't know, sir.
4  Q.   Now you know McClure is an east/west street.
5  A.   Yes, I do.
6  Q.   And the dispatcher was telling you that cars
7  were en route or -- let me see -- cars en route to
8  Ellis.  There's several cars leaving.  Last seen
9  going northbound on McClure.
10 A.   Uh-huh.
11 Q.   Did you notice that that couldn't possibly be
12 right?
13 A.   No, I noticed it says unintelligible, so maybe
14 they are saying going northbound towards McClure,
15 but I didn't notice it.
16 Q.   But you don't know that, do you?
17 A.   No, I don't.
18 Q.   All you knew was that cars were northbound on
19 McClure, right?
20 A.   I knew northbound on McClure, yes, sir;
21 northbound on McClure.
22 Q.   And that could not possibly have been right.
23 A.   No.
24 Q.   Did you respond to the dispatcher for
25 clarification about that?

1  A.   No, I didn't.

2  Q.   At 3:18 somebody, I don't know if it's a

3  dispatcher or another officer, said "Something on

4  Ellis."

5        Then at 3:50 the dispatcher said again or

6  announced again "Cars en route Ellis.  There is also

7  a black male on foot who ran northbound towards

8  McClure.  I'm taking a call on this as well."

9        Is that what your heard?

10 A.   Yes.

11 Q.   Do you know where you were at that time you

12 received that?

13 A.   I don't recall where I would have been at that

14 point, sir.

15 Q.   So you then got to McClure, went westbound on

16 McClure, turned off your headlights when you were

17 getting close to Archer, correct?

18 A.   Yes.  Or to Ellis.

19 Q.   Or to Ellis, yeah.  And you say you did that for

20 concealment purposes?

21 A.   Yes, sir, to help mask our movement as opposed

22 to having overhead lights and headlights on as I'm

23 approaching a shots fired call.

24 Q.   So nobody could see you approaching,

25 essentially.

A.   Yes.

Q.   You turned left onto Ellis.

A.   Yes, sir.

Q.   And then at some point you turned your headlights back on, and I believe that was -- you turned them back on when you saw a car beginning to come towards -- a car's headlights beginning to come towards you.

A.   Yes.

Q.   You turned your headlights back on.  Did you turn your overhead -- your emergency lights on?

A.   Yes, sir, I did.

Q.   So they were both on at that time?

A.   Yes.

Q.   You crossed Archer Street, and then you made the stop of this vehicle at 2222 North Ellis, correct?

A.   Yes, sir.

Q.   But I want to back up a little bit.

     When you first saw the headlights of that car, isn't it a fact that the car was pulling from the left side of Ellis as you were going southbound and turned right onto Ellis and approached you?  In other words, could you see -- could you see that the car came from the left side of Ellis Street, somewhere to the left of the street and turned right

1  onto Ellis and began approaching you?

2  A.   I recall it being a side profile.  I don't

3  recall whether it was facing east or west at the end

4  of that.  If I would have -- if I could look at a

5  video, maybe I could clarify that.

6          MR. ALVARADO:  Queue it up at about

7  15 seconds.

8          (Playing video.)

9  BY MR. ALVARADO:

10 Q.   And, officer, watch this as it is unfolding and

11 I will ask you questions about it.

12 A.   Yes, sir.

13          (Playing video.)

14 BY MR. ALVARADO:

15 Q.   You just turned southbound onto Ellis.

16          MR. ALVARADO:  And I will tell you when to

17 stop, Phil.  Stop.

18 BY MR. ALVARADO:

19 Q.   Didn't you see the headlights coming from the

20 left side of Ellis Street turning to the right and

21 beginning to head towards you?

22 A.   Are you able to replay it for me, sir?

23          MR. ALVARADO:  Okay.  Could you back it up

24 just a few seconds?

25          (Playing video.)

BY MR. ALVARADO:

Q.   Okay.  You are on McClure again.  You are
turning south onto Ellis.

        Did you see the headlights there?

A.   Yes, I did.

Q.   Did you see the headlights seeming to come from
the left of Ellis Street?

A.   It appears so, yes, sir.

Q.   And then turn right onto Ellis and begin to
approach you?

A.   I believe so, yes.

Q.   Now, from your vantage point, could you tell
what street address that car would have been coming
from?

A.   Not from there, no, sir.

Q.   In the dark you just cannot judge the
perspective of exactly where an object is?

A.   No, I knew it was near the dead end.  As far as
a specific address, no, I did not.

Q.   Right.  You knew that Ellis was a dead end to
the south.

A.   Yes, sir.

Q.   In fact the County Health Department is right
there, isn't it?

A.   That's correct, yes.

1  Q.  But you do acknowledge that it appears that this
2  car came from the left side of Ellis Street, whether
3  a driveway or an alley or whatever, it appears to be
4  turning onto the street from something off of the
5  street, right?
6  A.  It appears to be turning onto the street, yes,
7  sir.
8  Q.  And it appears to be heading -- like it didn't
9  back out of the driveway.  It seems to be coming
10 head forward and turning right northbound onto
11 Ellis, correct?
12 A.  Yeah, it appears that it is turning northbound
13 towards me.
14 Q.  Okay.
15      MR. ALVARADO:  Continue playing the tape.
16      (Playing video.)
17 BY MR. ALVARADO:
18 Q.  Okay.  You are crossing Archer Street.
19 A.  Yes, I am.
20 Q.  And the car is beginning --
21      MR. ALVARADO:  Stop it.  Stop, Phil.
22 BY MR. ALVARADO:
23 Q.  Okay.  At that point you are already turning
24 your squad car actually going into the northbound
25 lane, aren't you?

A.   Yes.

Q.   And you were basically indicating to the driver
of that car that you intend to stop that car.

A.   Yes, I was.

Q.   And that car -- well, first of all, let me ask
you this:  When the car got closer, when you can see
other things about this car, you didn't notice
anything particularly unusual about this car, did
you?

A.   Not at this point, no, other than it was leaving
the scene where I was dispatched to.

Q.   And when you actually -- when this car came to a
stop, when its forward progress stopped, it wasn't
committing any traffic violation at that point, was
it?

A.   No, sir, it did not.

Q.   You didn't observe any safety violations on the
vehicle like a burn out?

A.   No IVC violations, no sir.

Q.   Okay.  No registration violations?

A.   None that I'm aware of.

Q.   There was no reason for you to pull this vehicle
over other than what you learned from the dispatcher
and from your ShotSpotter display, right?

A.   That's correct.  It would have been an

1  investigative stop at this point.

2  Q.   I'm sorry?

3  A.   It was an investigative stop.  It hadn't

4  committed a traffic violation, sir.

5  Q.   Okay.  In fact the car was not trying to flee

6  you, right?

7  A.   No.

8  Q.   Now, at some point while you are coming

9  southbound on Ellis, you actually said, "Adam-10

10 10-7.  I got a car trying to take off northbound

11 here from the dead end on Ellis."

12         Now you remember making that call?

13 A.   Yes, I do.

14 Q.   And that -- you made that before you could

15 actually even see the occupants of the car, isn't

16 that correct?

17 A.   That's correct, yes, sir.

18 Q.   And when you used that phrase "trying to take

19 off northbound here," you weren't trying to say that

20 it was fleeing?

21 A.   No.  I believe that's what I was meaning to say

22 at the time but --

23 Q.   I'm sorry?

24 A.   I believe that's what I was meaning to say that

25 I have a vehicle that is taking off north on Ellis

1  from the dead end.

2  Q.   Okay.  But within seconds you realize that the

3  car was slowing down and did in fact stop its

4  forward progress.

5  A.   That's correct, yes, sir.

6  Q.   And when -- you said a second time at 5:31 into

7  the tape "Adam call 12974, it's trying to take off."

8  A.   Yes, sir.

9  Q.   You said that approximately one second before

10 its forward progress stopped, right?

11 A.   Yes, sir.  I believe so, sir, yes.

12 Q.   But it wasn't trying to take off at that point,

13 was it?  It was stopping, wasn't it?

14 A.   At that point, sir, as it was nearing my driver

15 side I feared for a second that it was trying to get

16 around my squad car, which is why I yelled "stop" as

17 I'm exiting.

18 Q.   The second time that you said "that it is trying

19 to take off," you believed that it was trying to go

20 around you?

21 A.   At first, yes, I did, sir.

22        MR. ALVARADO:  Can you continue playing?

23        (Playing video.)

24        MR. ALVARADO:  Stop it.

25 BY MR. ALVARADO:

Q.   That's the second time when you said, "It's
trying to take off," right?
A.   That's correct, sir, yes.
Q.   Isn't that about one second before it actually
stopped its forward progress?
A.   Yes, sir.
Q.   You weren't trying to convey to officers that
this car was fleeing the scene, were you, because --
A.   I believed it was trying to drive around my
squad car, yes.
Q.   You were trying to convey that impression to
other officers --
A.   Yes.
Q.   -- and the dispatcher --
A.   Yes, I was.
Q.   -- that this car was trying to flee?
A.   Initially that's what I believed, yes, sir.
With the proximity of his vehicle to my vehicle, I
believed he was attempting to continue to go around
me despite my overhead lights and spotlight.
Q.   And in spite of the fact that it was slowing
down and you could clearly see that.
A.   Yes, I could see that it was slowing, yes, sir.
Q.   In fact you could see that his brakes were
causing the back end of the car to dip down as the

1 brakes were --

2 A.   That I don't recall seeing.

3 Q.   But nevertheless, you know that it was slowing

4 down and coming to a stop one second after you said,

5 "It's trying to take off," right?

6 A.   Yes, sir.

7 Q.   Is it common practice that when you say "car's

8 trying to take off," that you're trying to tell

9 other officers that this is a potentially dangerous

10 car who was fleeing and eluding a police officer?

11 A.   I'm attempting to alert that I believe this

12 vehicle is trying to get away from me, yes.

13 Q.   And at that point when it stopped its forward

14 progress, you've considered that vehicle -- at least

15 you were intending to control it at that point --

16 you believed that you had seized that vehicle.

17 A.   As far as I had seized it?

18 Q.   You had stopped its forward progress.

19 A.   Yes, it had stopped.

20 Q.   Now at that point when you stopped that car, the

21 only thing you knew was that there were two rounds

22 fired at 2203 North Ellis from your ShotSpotter

23 display.  A little bit later on you learned through

24 your dispatcher that there were another two rounds,

25 but you didn't confirm that through the ShotSpotter

1 display in your car, right?

2 A.   Correct.

3 Q.   And then you learned that "Cars were en route to

4 Ellis.  There are several cars leaving, last seen

5 going northbound on McClure."  Then you received the

6 second message, "Cars en route Ellis.  There is also

7 a black male on foot who ran northbound towards

8 McClure.  I'm taking a call on this as well."

9 A.   Yes, sir.

10 Q.   That is the sum total of information that you

11 possessed that made you stop that car.

12 A.   Yes, sir.

13 Q.   Is that right?

14 A.   Yes, that's correct.

15 Q.   But at no time prior to you putting on your

16 overhead lights and stopping that vehicle, did you

17 try to clarify from the dispatcher as to how a

18 vehicle -- vehicles could be going northbound on

19 McClure?

20 A.   No, sir.

21 Q.   Even though you had come from the east of

22 McClure and you didn't see any vehicle.

23 A.   That's correct.

24 Q.   Is there some reason why you didn't do that?

25 A.   I couldn't tell you what my thought process was

at that time, sir.  I don't know why I wouldn't have
clarified it.

Q.   You had no information about any description of
a vehicle or vehicles leaving 2203 North Ellis after
the ShotSpotter call came in, did you?

A.   No, sir.

Q.   You had no idea how many people, if any, were in
these vehicles that were going northbound on McClure
according to your dispatcher; is that right?

A.   That's correct.

Q.   You did not know the make, model, or color of
these cars?

A.   No, I did not.

Q.   You had no idea whether a person who had done
any shooting was in one of those vehicles, right?

A.   No, sir, I didn't.

Q.   You didn't even know if there was a weapon in
one of the vehicles that was supposedly leaving on
McClure.

A.   No, that's correct.

Q.   And you had no idea of the race of the
individuals who were in the vehicles that were
supposedly northbound on McClure.

A.   No, sir, I didn't.

Q.   The only thing you knew was that there was one

black male running on foot.

A.   That's correct.

Q.   You didn't even know if there was anybody in those vehicles who had been shot.

A.   No, I did not.

Q.   And you had no information that anyone had in fact been shot until after the stop of that car, and then you learned that Rickmon had been shot.

A.   Excuse me.  That's correct.

Q.   But yet you stopped that car.

A.   Yes, I did.

Q.   Even though three and a half minutes passed -- well, actually, to be fair, it was less than three and a half minutes before you learned that there were cars going northbound on McClure; something less than three and a half minutes -- well, let me -- strike that.  Let me take that back.

      There has been testimony that from 2203 North Ellis to 2222 Ellis, where you stopped this vehicle, approximately -- it is approximately 276 feet from those two locations.

A.   Yes, sir.

Q.   And Ellis, from the dead end on Ellis to Archer, it's really a pretty short street overall, isn't it?

A.   I believe so, yes, sir.

Q.   And because it's a dead end, you knew that any
cars had to come from -- had to come northbound on
Ellis.
A.   That's correct, yes, sir.
Q.   People could run on foot off in between houses
and so forth, the cars had to come northbound.
A.   That's correct.
Q.   And you learned some time short of three and a
half minutes that these cars were already on
McClure, right?
A.   Yes.
Q.   And you knowing Ellis Street so well, you would
know it doesn't take three and a half minutes to get
from even the end of Ellis past Archer or even
McClure.
A.   That's correct.
Q.   Especially if these cars are fleeing some type
of a shooting incident, it would take far less than
three and a half minutes to do that, right?
A.   That's correct.
Q.   And yet you stopped this car that apparently was
pulling out from the left side of Ellis and
approached you in a slow manner towards you, right?
A.   That's correct.
Q.   It never appeared to be going at any high rate

1 of speed, did it?

2 A.   No, sir.

3 Q.   It was going well under the speed limit for

4 Ellis Street, wasn't it?

5 A.   It appeared so.

6 Q.   You testified that when you stopped the car, the

7 people inside were pointing back and saying words to

8 the effect of that there is people back there.

9 A.   That's correct, sir.

10 Q.   Pointing towards 2203 North Ellis, right?

11 A.   Pointing back towards the dead end, yes, sir.

12 Q.   At what point did you first notice people

13 congregating, milling about 2203 Ellis?

14 A.   It would have been very shortly after.

15 Q.   You didn't see those people when you're driving

16 down Ellis?

17 A.   No, sir, I didn't.

18 Q.   Did you see anyone on Ellis prior -- from when

19 you passed Archer, did you see anyone on the street

20 or off to the side of the street until after you

21 stopped the car?

22 A.   I don't recall seeing anyone, no, sir.

23 Q.   And by the way, since you know the 2200 block of

24 Ellis so well, you know that 2203 would be on the

25 right side as you were coming down.

A.   I do, on the west side of the street.

Q.   And this vehicle that you saw was coming from the left side of Ellis?

A.   That's correct.

Q.   And appeared to -- in fact, you don't really know exactly how far down along that block that the car turned onto Ellis from.

A.   No.  I don't know how it would have turned around, whether it backed into or turned into a driveway to get situated back north.

Q.   You're speculating about that, aren't you?

A.   No, I'm saying I have no idea, sir.  I couldn't tell you what the vehicle's actions were or what it would have taken.

Q.   Right.

A.   I just only know that it appeared to be turning right or northbound back towards me.

Q.   Right.  You could see that.

A.   Yes, sir.

Q.   Right.  And prior to the car coming to the end of its forward progress, you couldn't tell or could you tell how many people were in the car?

A.   At this point, yes, I was able to see that there were three occupants.

Q.   Basically at the time the car stopped.

A.   Yes, sir.

Q.   That's when you noticed there were three people in the car.

A.   Probably very shortly beforehand.  It was as they were close enough, my spotlight was able to illuminate the interior of the car.

Q.   Then you observed that they were three African-American people.

A.   Yes.

Q.   Now you testified that after you stopped the vehicle, that the car began to go a little bit backwards.

A.   Yes, sir.

Q.   And that the driver's hand or hands was outside of the vehicle and pointing to the back --

A.   Yes, sir.

Q.   -- towards the south of Ellis Street?

A.   Yes, sir.

Q.   You didn't take that as a threatening gesture towards you, did you?

A.   No, sir.

Q.   And you're not saying here that you saw any kind of movements inside the vehicle that would indicate to you that somebody is trying to hide something like a weapon?

A.   No.

Q.   You're not saying that, are you?

A.   No, sir.  There was a lot of hand movements but they all appeared to be up where I could see them. They were complying.

Q.   And it would be natural for anybody in that situation, if gunshots had been fired, to be excited under those circumstances.

A.   Absolutely, yes, sir.

Q.   Especially when a Peoria police officer is walking up to them with his gun out, right?

A.   I would assume so, yes, sir.

Q.   I mean, you would acknowledge that it is not unusual for African-American people in the City of Peoria to feel a little bit uncomfortable and get a little excited when a Peoria police officer starts walking up to them with a drawn gun, right?

A.   I wouldn't be able to tell you what people think, but I could understand that feeling, yes, sir.

Q.   You know that Peoria police officers have shot at least two African-American people to death in the last year or so.

A.   I'm aware of that, yes, sir.

         MR. HANNA:  Your Honor, I don't know where

1  we are going with this.  It is supposed to be --

2          THE COURT:  Well, the question has been

3  asked and answered.  Let's see where we go.

4          MR. ALVARADO:  Could you queue up the tape

5  at 30 seconds and then play it forward?

6  BY MR. ALVARADO:

7  Q.  Officer, I'm going to show you the video again

8  from approximately 30 seconds into this and forward,

9  and then I'm going to ask you some questions about

10 it, okay?

11 A.  Yes, sir.

12         (Playing video.)

13         MR. ALVARADO:  Okay.  Stop.

14 BY MR. ALVARADO:

15 Q.  And just to make it clear, I'm not sure if I

16 asked you this question, but when you said "trying

17 to take off" that second time; the car stopped, was

18 stopping and did stop.

19 A.  It was right up in my front bumper, yes, sir.

20 Q.  And wouldn't it be natural for the car to back

21 off of your front bumper because it was so close,

22 the cars were so close?

23 A.  I would hope that they wouldn't get that close

24 to begin with, which is why I made my radio traffic

25 -- that's fine, that's what I wanted -- I wanted

1  them to stop where they were; they had backed up.

2  Q.   Right.  And he backed up a little bit to get --

3  A.   Yes, sir.

4  Q.   -- a little bit away from your squad car.

5  A.   Yes, he did.

6  Q.   Nothing particularly unusual about that, right?

7  A.   No, sir.

8  Q.   But nevertheless you think they are trying to

9  get away from you when that car was backing up for

10  that little brief --

11  A.   Not once he was backing up, no, sir.

12  Q.   Okay.  So the only point where you say it was

13  trying to take off was when it was coming towards

14  you?

15  A.   Yes, near my driver's front bumper there.

16      MR. ALVARADO:  Could I have just a moment,

17  Judge?

18  BY MR. ALVARADO:

19  Q.   Officer Ellefritz, when you turned from McClure

20  onto Ellis and began approaching 2203 Ellis --

21  A.   Yes, sir.

22  Q.   -- wasn't it your intention to stop any vehicle

23  you saw coming towards you based on what you --

24  A.   At that point, yes, I would have stopped a

25  vehicle in that general area.

```
1  Q.   Whether it contained a shooter, a victim, a
2  witness, or even just an innocent --
3  A.   I'm sorry.
4  Q.   -- or an innocent person who had no knowledge of
5  any of the events; you intended to stop any vehicle
6  that came northbound on Ellis towards you.
7  A.   Yes, sir.  I have no knowledge of who would have
8  been inside the car at that point.
9  Q.   So if someone had dropped, just dropped off a
10 person from leaving a 4:00 club closing and was
11 going home themselves, you were going to stop that
12 car, right?
13 A.   In that area, yes, sir.
14 Q.   Or if a Peoria Journal Star person was
15 delivering papers to the 2200 block of Ellis and was
16 just trying to leave Ellis, you were going to stop
17 them, right?
18 A.   I would have had no way of knowing, so, yes,
19 sir, I would have.
20 Q.   Or if it was somebody going to an early mass,
21 you were going to stop that car, right?
22 A.   Yes, sir.
23 Q.   And you had no idea whether the occupants of the
24 vehicle had done anything unlawful or were victims
25 of anything unlawful at that point.
```

1  A.   I have no way of knowing that, sir, at that
2  point, no.
3       MR. ALVARADO:  Your Honor, I have nothing
4  further.
5       THE COURT:  Mr. Hanna.
6       MR. HANNA:  Briefly, Judge.
7                REDIRECT EXAMINATION
8  BY MR. HANNA:
9  Q.   Officer Ellefritz, defense counsel asked you
10 about you not knowing or able to tell from that
11 distance what address the vehicle pulled out from
12 but you acknowledge that it came from the left side
13 of the street.
14 A.   That's the way it appeared on the video, yes,
15 sir.
16 Q.   Is there an alley at the end of that street?
17 A.   No, there is no alley there.
18 Q.   Did you know that there was no alley at the end
19 of that street when you were approaching?
20 A.   I knew there was no east/west alley.
21 Q.   Okay.  And defense counsel also asked you
22 wouldn't it be natural for persons who witness
23 gunshots to be excited; do you agree with that?
24 A.   Yes, sir, I do.
25 Q.   What state of emotion did you observe when you

1  immediately turned the lights on and initiated a

2  traffic stop here?

3  A.   They all appeared excited.

4  Q.   Okay.  Did you draw any conclusions based upon

5  that observation that everyone in the car was

6  pointing down the street and waving their arms

7  around in an excited state?

8  A.   No, sir; no.

9  Q.   Did you believe based upon that observation that

10  they had some knowledge of what had happened?

11  A.   Yes, sir.

12  Q.   And is it in fact part of your duties as a

13  police officer to respond to a scene not only to

14  investigate suspects but to also locate victims?

15  A.   Yes, sir.

16  Q.   And in fact you testified that that was part of

17  the reason that you conducted this traffic stop,

18  correct?

19  A.   Yes, sir.

20        MR. HANNA:  I have no further questions,

21  Judge.

22        THE COURT:  Mr. Alvarado, anything?

23        MR. HANNA:  Nothing further.

24        THE COURT:  Thank you, sir.  You may step

25  down.

1          All right.  Next witness.

2          MR. HANNA:  Call Lieutenant Wetzel, Your

3   Honor.

4          THE COURT:  Do you anticipate recalling

5   Officer Ellefritz?

6          MR. ALVARADO:  I don't, Judge.

7          MR. HANNA:  I do not, Your Honor.

8          THE COURT:  Then he can leave or he can stay

9   in the courtroom, whatever he wishes to do.

10         Okay.  Next witness.

11         THE COURT:  Sir, do you want to come forward

12  please.

13         (Witness sworn.)

14         THE COURT:  Okay.  Have a seat please.  And

15  I think that you might have the mic right.

16         Those should pick you up.

17         Go ahead, Mr. Hanna.

18                    SHAWN WETZEL,

19  after having been duly sworn, testified as follows:

20                  DIRECT EXAMINATION

21  BY MR. HANNA:

22  Q.   Please introduce yourself, sir.

23  A.   I'm Lieutenant Shawn Wetzel with the Peoria

24  Police Department.

25  Q.   How long have you been with the Peoria Police

1  Department?

2  A.    Twenty-six years.

3  Q.    What are your current duties?

4  A.    Currently assigned to professional standards.

5  Q.    You also have some duties that deal with the

6  collection of records and distribution of records

7  for FOIA for the Peoria Police Department?

8  A.    Yes, I do, periodically.

9  Q.    Okay.  Are your job duties changing pretty soon

10 here as well?

11 A.    That's correct.  In 2019 I will start with the

12 records division.

13 Q.    Okay.  You have been working in the records

14 division a little bit lately?

15 A.    Yes, I have.

16 Q.    In both of your experiences as an officer and

17 working with records, have you become familiar with

18 the dispatch and just general information systems of

19 the Peoria Police Department?

20 A.    That's correct.

21 Q.    Can you explain how the Peoria Police Department

22 911 -- or I'm sorry -- City of Peoria 911 dispatch,

23 the relationship between that and the Peoria Police

24 Department?

25 A.    Yes.  All of the dispatchers are city employees.

1  They work under the entity of Emergency
2  Communication Center, and that is actually in the
3  old police station right next door to the current
4  police station.
5  Q.   Okay.  And they are not employees of the Peoria
6  Police Department, correct?
7  A.   That's correct.  They are city employees but not
8  police department.
9  Q.   Okay.  And can you tell us what CAD is, C-A-D?
10 A.   CAD is computer assisted dispatching.
11 Q.   What does that mean?
12 A.   That is a software that was utilized to record
13 the events of dispatching.
14 Q.   And where is that software utilized with regard
15 to patrol vehicles?
16 A.   That software is utilized in multiple places.
17 It's utilized in all of the squad cars.  Also in the
18 dispatch center.  In any of the terminals across the
19 police department that need access to that
20 information.
21 Q.   And how does dispatch provide information from
22 911 calls to its officers?
23 A.   They provide it through radio and they provide
24 it through CAD.
25 Q.   And what is the radio called?

A.   Well, there is multiple different channels, but
we use Prep 1 as our primary channel.

Q.   Okay.  Are you generally familiar with the
ShotSpotter gunfire detection system in Peoria?

A.   That's correct, I am.

Q.   Does that system use acoustic sensors that are
placed throughout the city to detect gunfire
incidents?

A.   That's correct.

Q.   And are there in fact two zones that are
covered, geographic areas, that are covered by the
ShotSpotter system?

A.   That's correct.

Q.   And what form -- just quickly -- does the
ShotSpotter alert show up to an officer?

A.   There are several different forms.  The primary
form is the software, the ShotSpotter software, is
installed on all of the laptops.  The officers also
have access to be able to hear it or be notified of
it through cellular phone devices if they choose.

Q.   And when you say "laptops," you also mean those
that are installed and utilized within the Peoria
Police Department squad cars, correct?

A.   That's correct.

Q.   Is 911 dispatch for the City of Peoria have the

ShotSpotter console as well?

A.   Yes, they do.

Q.   In addition to the alerts of gunfire shortly after they occurred, does ShotSpotter also offer as part of its service an investigative portal?

A.   Yes, it does.

Q.   Can you describe generally what that means or what I'm talking about?

A.   The investigative portal provides you more information to be able to review the actual audio from each of the different sensors.  It allows the officer to go back and look at the geographic location of each of those individual shots as well.

Q.   So is that an investigative portal, so to speak?

A.   Yes, it is.

Q.   And it's a historical database of gunshot incidents?

A.   That's correct.

Q.   Were you asked to review recently through an incident portal or look at some documents from that incident portal from a shooting that occurred on July 29th on Ellis Street?

A.   That's correct.

        MR. HANNA:  Mr. Clerk, if I could have an overhead please.

BY MR. HANNA:

Q.   This Government's Exhibit Number 2, second page

of Government's Exhibit 2, which is also in the

response, Government's Motion to Respond.  Can you

tell me what you see on your screen here?

A.   This is a ShotSpotter screen that allows you to

be able to look at specific information.

Q.   And this is from the investigative portal side

of the ShotSpotter services, correct?

A.   Yes, it appears to be so, yes.

Q.   And can you tell us what information, starting

from the back row there, that this portal provides

about this 7/29 incident?

A.   The very bottom is a set of shots that had

occurred with the timestamp and a date as well.

Q.   Okay.  And it says July 29th, 2018.  And the

time there is 4:40:02, correct?

A.   That's correct.

Q.   And the "02," is in seconds; am I correct?

A.   That is correct, seconds.

Q.   And the address for these first three shootings

is what?

A.   I'm sorry, the question again.

Q.   There is 2203 North Ellis is the location for

the first shootings, correct?

1  A.   That's correct.

2  Q.   And what does "RNDS" stand for under the

3  categories there?

4  A.   That's the number of rounds that were recorded.

5  Q.   So how many rounds of -- and that means gunfire,

6  correct?

7  A.   That's correct.

8  Q.   How many rounds of gunfire were reported at

9  4:40:02?

10 A.   It shows two.

11 Q.   And the second line there with 4:40:08, would

12 that then be six seconds later?

13 A.   That's correct, six seconds.

14 Q.   How many rounds were reported then?

15 A.   That shows three.

16 Q.   Is that the same location of 2203 North Ellis?

17 A.   Yes, it is.

18 Q.   The next lineup is 4:40:39, correct?

19 A.   That's correct.

20 Q.   Is that at the same location 2203 North Ellis?

21 A.   It is.

22 Q.   And how many rounds were reported by ShotSpotter

23 at that time?

24 A.   Two rounds.

25 Q.   And then it's a little difficult to tell on this

1  exhibit, but if you go an a little bit further the
2  address is different, correct?
3  A.   That's correct.
4  Q.   What does that say?
5  A.   4:40 and 44 seconds at 2210 North Ellis.  It
6  showed I believe eight rounds.
7  Q.   Okay.  And this portal also provides a map of
8  those particular gunfire incidents, correct?
9  A.   That's correct.
10 Q.   And I shifted the exhibit over to the right so
11 you can see a map.
12        Do you see what street this is on?
13 A.   It is on Ellis.
14 Q.   And what are those red markers?
15 A.   Those red markers are the individual GO
16 locations that the ShotSpotter had recognized where
17 they came from.
18 Q.   Have you recently inquired with the ShotSpotter
19 company about how the timestamps are synchronized in
20 their cases?
21 A.   Not with the ShotSpotter company.  I checked
22 with our IT staff that involves all of the computers
23 and software for the City of Peoria.
24 Q.   Do you recall how ShotSpotter timestamp are
25 determined?

A.   Yes.  ShotSpotter records it from an atomic
clock that is related to GPS, the GPS timeserver.
Q.   Okay.  Is that in fact a different source of
time synchronization than the CAD system in the
Peoria Police Department computers?
A.   That's correct.
Q.   And could that also be different from the Peoria
-- City of Peoria's dispatch systems?
A.   That's correct.
Q.   So if you were to review this case from both the
ShotSpotter portal to dispatch records and then
other sources of data from the Peoria Police
Department, you may not necessarily have all of the
time, exact times, correct?
A.   That's correct.
Q.   Okay.  You were asked, were you not, recently to
capture AVL data from this incident from MapForce?
A.   That correct.
Q.   What is AVL data?
A.   AVL is Automatic Vehicle Locater.  It is GPS
software and data to track all of their vehicles.
Q.   And when you demonstrate that or produce that in
some kind of animation form, how do you produce that
information, or how did you in this particular case?
A.   Are you asking in reference to the recording?

1  Q.   Yes, yes, I am.

2  A.   I utilized an Open Source Software called Amp

3  Studio Recorder to record the AVL software or the

4  MapForce software.

5  Q.   Did you produce two short videos that will

6  demonstrate the GPS location of a number of Peoria

7  Police Department vehicles on July 29th of this

8  year?

9  A.   That's correct.

10  Q.   Okay.

11       MR. HANNA:  Mr. Clerk, if I could have the

12  computer screen again, please.

13  BY MR. HANNA:

14  Q.   Placed on the screen is what has been marked as

15  Government's Exhibit Number 8.

16       Do you recognize this?

17  A.   Yes, I do.

18  Q.   And what is it?

19  A.   This is the screen capture of the recording that

20  I made in reference to being able to record the AVL

21  software or the MapForce software.

22  Q.   And this is a minute and 32 second video.  Can

23  you -- I'm going to hit play here and as we go along

24  you can describe what we are seeing, okay?

25       (Playing video.)

BY MR. HANNA:

Q.   I've stopped it at three seconds.

What do we see on this screen at this point in time?

A.   This here is the complete user interface of the MapForce software that allows us to be able to initiate a search.

Q.   Are these the various police districts as they are mapped throughout the City of Peoria?

A.   Yes, this will be a different section from the City of Peoria to include the respective districts.

Q.   And in this case you were asked to prepare basically GPS data with regard to an incident that occurred at 2203 North Ellis Street; is that correct?

A.   That's correct.

Q.   And that's in District 11?

A.   Yep.

Q.   Now in this particular Exhibit Number 8, which vehicle are you honing in on, its GPS coordinates?

A.   This is the first exhibit.  It's going to zero in on 3-Adam-10.

Q.   Okay.  Do you know from your involvement in this case who 3-Adam-10 is, the specific name for that vehicle?

A.   3-Adam-10 is driven by Officer Ellefritz.

Q.   And play at five.

     You see a green on seven seconds into this
video, a green box with 3810.  What does that
represent?

A.   When it is green it's representing that they are
on duty, but they are not available for calls yet,
so they are just preparing for calls.

     MR. HANNA:  And can you play.

BY MR. HANNA:

Q.   If you could just describe what we are seeing
right now.

     (Playing video.)

A.   It just turned white, which means that they are
available for calls, and it looks like it is
patrolling.

BY MR. HANNA:

Q.   And what street is it on at this point in time?

A.   McClure Avenue.

Q.   This is 29 seconds into the video.

     Which direction is 3-Adam-10 headed?

A.   According to the blue dots, it's indicating that
they are going eastbound.

Q.   Okay.  And does this timestamp up in the upper
left-hand corner, it says "record information time."

What information do you have at 29 seconds here?

A.   It's going to be 4:31 and one second.

Q.   Okay.  I'm going to hit the play.

          (Playing video.)

BY MR. HANNA:

Q.   Okay.  Stopped it at 53 seconds.  Now there has
been a change here.

          What do you see on the screen?

A.   3-Adam-10's indicator that just turned red,
which indicates that they have been assigned to a
call.

Q.   And on the upper left-hand record information,
what time is that on the MapForce?

A.   It indicates that 4:42 and 15 seconds.

Q.   I'm going to hit play.

          What are we observing here?

A.   Now we are just watching him respond to wherever
he is dispatched, proceeding northbound on Prospect,
and then eastbound or westbound on McClure.

Q.   Okay.  I've stopped this at 1:26 on the video
timer.

          What do you observe here?

A.   Here it appears that he has arrived to the area
that he was dispatched to and the time is 4:45 and
23 seconds.

1  Q.   Continuing to play.

2         Now were you also asked to produce similar

3  video that included all of the vehicles that

4  responded within a certain period of time to this

5  incident?

6  A.   That's correct.

7  Q.   Okay.  I'm going to play for you Government's

8  Exhibit Number 9.

9         (Playing video.)

10  BY MR. HANNA:

11  Q.   Do you recognize this?

12  A.   Yes.

13  Q.   Is that the video that I just asked you about?

14  A.   Yes.  In the very beginning it showed a search

15  criteria and that search criteria was for the date

16  and the time frame with no vehicles, which indicates

17  that it will show all vehicles.

18  Q.   Okay.

19         MR. HANNA:  Play.

20         And this video is a total of two minutes and

21  nine seconds long.

22         (Playing video.)

23  BY MR. HANNA:

24  Q.   Stopped the video at 37 seconds into this.

25         What time appears up on the record

1 information there?

2 A.   The time is 4:42 and seven seconds.

3 Q.   And what appeared in the center of that screen?

4 A.   The center of the screen shows an indicator of

5 21-P which is a CAD call that is coming in and being

6 generated for that area.

7 Q.   That would be an indication then that something

8 has happened at that location and dispatch has sent

9 the officers there?

10 A.   That's actually an indication that dispatch is

11 generating a call and entering information into the

12 computer.  So before dispatching somebody, you have

13 to generate the call within the CAD system.

14 Q.   Okay.  And the "11" in this case is -- what is

15 that that you see in the white box, the 11?

16 A.   The 11, that's the respective district, 11

17 District.

18 Q.   And the 10 on the right?

19 A.   The 10, that's 10 District on the other side.

20        MR. HANNA:  Can you play it for 37 seconds.

21        (Playing video.)

22 BY MR. HANNA:

23 Q.   Stopped at 53 seconds.  What do you observe now?

24 A.   Right now 3-Adam-10 has entered the screen and

25 shows that he is red, which indicates that he is

1  responding to a call.

2  Q.   You can play.

3        As this plays if you would tell us what we

4  are observing now.

5  A.   Now we are seeing 3-Adam-5 coming up from the

6  same direction as well as 3-Adam-13 coming from the

7  north, and arrived second as a secondary officer, a

8  backup officer; and then 3-Adam-5 shows up as a

9  third officer arriving on scene.

10        We can see at the bottom 3-Adam-12 and

11  3-Adam-3 are responding just off the interstate 74

12  and will eventually come up to the area of that

13  call.

14  Q.   I'm going to stop this at 1:52.

15        MR. HANNA:  Can we have the overhead?

16  BY MR. HANNA:

17  Q.   On the screen here is what has been marked as

18  Government's Exhibit 9-1.

19        Do you recognize this?

20  A.   Yes, I do.

21  Q.   And did you have an opportunity to review this

22  data and compare that with what you have seen on the

23  AVL data on MapForce before coming into court today?

24  A.   Yes.

25  Q.   Does this 9-1 appear to accurately represent the

arrival time of the various officers for the 2203

North Ellis call on July 29, 2018?

A.   Yes, it does.

Q.   Showing you what has been labeled Government's

Exhibit Number 1.

Do you recognize this?

A.   Yes, I do.

Q.   What is this?

A.   This is a closed-incident report.  This is

actually like a CAD printout of that incident.

Q.   Where did this information come from?

A.   This comes from the dispatch center or the

software CAD.

Q.   Okay.  And where did you -- did you obtain this

document?

A.   I'm aware of this document, and, yes, I've

reviewed it.

Q.   Is this a document that is prepared by dispatch

that works for the City of Peoria?

A.   This document can actually be prepared by

anybody that has software, access to the software;

you can just simply print it out.

Q.   Okay.  Can you tell me the significance of the

incident date and time in the upper left-hand

corner?

1  A.   Yes.  July 29, 2018, 4:45 a.m. and 55 seconds.

2  Q.   And do you see the dispatched address set forth

3  on here?

4  A.   That's correct.

5  Q.   And do you see it says 2203 North Ellis?

6  A.   Yes, the address is 2203 North Ellis Street.

7  Q.   And towards the middle of the page on the left

8  there is -- there is initiating call and handwriting

9  begin time.  What is that?

10  A.   The begin time initial -- when they are

11  initiating a call, they are entering the data in

12  there prior to dispatching.

13  Q.   Okay.  And how is this information generated?

14  How is this report generated?

15  A.   This is actually generated by anybody who is a

16  dispatcher that is involved with specific radials.

17  In this event it would be a dispatcher that is

18  responsible for this area of the city.  And also,

19  any dispatcher that may be receiving 911 calls or

20  other information that needs to make those entries

21  onto the CAD screen.

22  Q.   This is the second page of this document,

23  Government's Exhibit Number 1.

24       Do you see the dispatcher's remarks there?

25  A.   Yes, I do.

1  Q.   What is this information?

2  A.   This is any information that comes in from

3  either one dispatcher or several dispatchers.  On

4  the right-hand side, you can see actually dispatcher

5  initials which indicated that several people were

6  making entries into this call.

7  Q.   And what is the significance?  What does the

8  first line there say?

9  A.   The first line indicates a report of gunfire,

10 shows two rounds at 2203 North Ellis.

11 Q.   And then again the date is?

12 A.   It's going to show July 29, 2018, at 4:41 and

13 56 seconds.

14 Q.   Okay.  And the timestamp in regard to this

15 dispatch, is that a keyed entry that is done by a

16 person?

17 A.   No, that is actually an automatic timestamp when

18 the dispatcher enters that information.  So similar

19 to a computer when you hit the enter key that is

20 going to provide a date and a timestamp.

21 Q.   Okay.  Showing you the third page of

22 Government's Exhibit 1.

23       Do you see "call unit history log" there?

24 A.   I can see that, correct.

25 Q.   Do you see, with your review of this case,

1  3-Adam-10 as being in this log?

2  A.   That's correct.

3  Q.   And the dispatched time is set at 4:42:05?

4  A.   That's correct.

5  Q.   And he is PP1126, correct?

6  A.   I'm sorry.

7  Q.   He has set forth his badge number as PP1126?

8  A.   That's correct.  That is Officer Ellefritz'

9  badge number.

10 Q.   Okay.  As you go down these lines, do you see a

11 marking of arrival at scene set forth in

12 chronological order on this document?

13 A.   You see various people that have been dispatched

14 and arrived on scene, that's correct.

15 Q.   And would it appear to you that the dispatch,

16 this document has 3-Adam-13 arriving at the scene

17 first?

18 A.   Yes, I can see that.  3-Adam-13 at 4:45:52,

19 correct.

20 Q.   And then the next to arrive according to this

21 dispatch log would be 3-Adam-5; is that correct?

22 A.   That is correct.

23 Q.   And it's some ways down here that 3-Adam-10

24 arrives at scene and it looks to indicate 4:48:04,

25 correct?

1  A.    That's correct for arriving.

2  Q.    Based upon your review of the GPS data in this

3  case, would that appear to be inconsistent with

4  regard to the arrival time?

5  A.    Yes.

6  Q.    Which is more reliable?

7  A.    It's going to be the AVL mapping force.

8  Q.    And why?

9  A.    Well, the mapping force -- there is no human

10  interaction.  It is all done on geographic GPS

11  coordinates and time-stamping itself.  So AVL is

12  going to be much more accurate and precise.

13  Q.    Okay.  At the government's request did you also

14  retrieve a 911 call from this incident that was

15  associated with the shooting on 2203 North Ellis

16  Street?

17  A.    Yes, I did.

18        MR. HANNA:  Your Honor, I move for the

19  admission of Government's Exhibit Number 1, 2, and

20  9-1.  We are not going to play the 911 audio.  I had

21  a discussion with Mr. Alvarado before court today.

22  I do think that it's pertinent that that call was

23  placed and that the information that was conveyed to

24  Officer Ellefritz, through dispatch, that content

25  alone, which is information that Ellefritz had at

the time he responded is relevant, but I'm

submitting and asking submission of the 911 call for

purposes of establishing that there was in fact a

911 call, but would like the Court to consider the

limited portion of that, that it was conveyed to

Officer Ellefritz when he responded.

THE COURT:  Mr. Alvarado, first of all, any

objection to the exhibits being offered by

Mr. Hanna.

MR. ALVARADO:  Right.  And he is offering

Exhibit 1 and 6 at this time?

MR. HANNA:  1, 2, 9-1, and then the video

animations, 8 and 9 of the AVL MapForce, and then

the limited submission of the 911 call.

THE COURT:  Which is part of what, Number 6?

MR. HANNA:  It's independent, Judge.

THE COURT:  Any objection, first, before we

discuss the 911 call?  Any objection?

MR. ALVARADO:  Your Honor, I have no

objection to Exhibit 1, the dispatcher's log, with

this caveat:

The information that is conveyed in that log

is not relevant to the issue of whether there is

reasonable suspicion because Officer Ellefritz did

not know about it at the time he made the stop.  So

1  I don't want the Court to be confused about that
2  issue and think that the information that's noted
3  there was something in Officer Ellefritz' knowledge.
4  The times that are noted on the dispatcher log are
5  accurate.  And I believe that's the purpose that
6  Mr. Hanna is offering it for.  And I have no
7  objection then to that exhibit.
8          THE COURT:  All right.
9          MR. ALVARADO:  As to Exhibit 2, I have no
10 objection.
11         As to Exhibit 6, I have no objection.
12 Mr. Hanna I think stated that pretty correctly, but
13 just to emphasize, along with Exhibit 1, the call
14 itself was not heard by Officer Ellefritz.  He only
15 heard what the dispatcher relayed that you have
16 already heard, and that is the only part that is
17 relevant, not that he heard the content of that 911
18 call, but I don't object because at least it
19 indicates to the Court that there was a 911 call and
20 that he didn't just make it up.
21         THE COURT:  Fair enough.
22         Mr. Hanna?
23         MR. HANNA:  Yes, Your Honor.
24         THE COURT:  Okay.
25         MR. ALVARADO:  And I have no objection to 8

or 9, or 9-1.  And was 9-2 offered as well?

THE COURT:  Earlier, I think.  Previously.

MR. HANNA:  Yes.

MR. ALVARADO:  Okay.

THE COURT:  They will be admitted.

Anything else?

MR. HANNA:  No, Your Honor.

THE COURT:  Mr. Alvarado.

MR. ALVARADO:  Your Honor, I just have a
couple questions.

THE COURT:  All right.

CROSS-EXAMINATION

BY MR. ALVARADO:

Q.   Lieutenant Wetzel, I know that you are not an
expert in the ShotSpotter system, but you have some
general familiarity with it, don't you?

A.   That's correct, sir.

Q.   Are you aware that when ShotSpotter's
microphones, the sensors that pick up the sound,
that those sensors then relay that data to a server
somewhere in California?

A.   That's correct.

Q.   And then an actual human being takes that
information, listens to it to confirm whether it's
believed to be a gunshot or not, correct?

A.   Yes.

Q.   And at that point that's when the alert is made
to the police department about a ShotSpotter alert,
right?

A.   Yes.  Once it's validated, it is allowed to
proceed as an alert.

Q.   In this particular case, you don't know how much
time went by before or from the time the sensors
picked up the sound of gunshots until the time it
made the alert to the Peoria Police Department; you
don't know how much time passed, isn't that correct?

A.   All I know is what the company advertises on
their web site.

Q.   But in this particular incident, you don't know
how long it took for ShotSpotter to take the
information, confirm it, and then relay it to the
Peoria Police Department?

A.   Correct.  For this specific call, that's
correct.

Q.   It could have been minutes, right?

A.   Not according to the company.

Q.   What is your knowledge as to how long the
average report would take?

A.   The company says that it's within seconds after
the acoustic sensor recognizes it, passes it on to

the incident center, which is then reviewed by an

acoustic specialist, then it is passed -- once it's

validated, it is passed onto the agency, and they

advertise that's within seconds.

Q.   But as part of your preparation for your

testimony today, you didn't learn from ShotSpotter

how long it actually took for the sensors once they

picked up the sounds until the report to the Peoria

Police Department was made?

A.   Actually that was the training that we received

in 2013.  And I reviewed that training that we had

in 2013 to remember that, that's correct.

Q.   Right.  But I'm asking you, as part of your

preparation for your testimony, you did not ask

ShotSpotter to try to determine from the time of the

gunshots to when they verified it until they made

the report to the Peoria Police Department that

there was gunshots occurring at 2203 Ellis, right?

A.   I did not communicate with ShotSpotter in

reference to this call.

        MR. ALVARADO:  Okay.  Your Honor, I have

nothing further.

        THE COURT:  Mr. Hanna?

        MR. HANNA:  Nothing further, Your Honor.

        THE COURT:  Okay.  Sir, thank you.  You may

1  step down.

2          MR. ALVARADO:  I just want to say one thing

3  also with respect to one of the government's

4  exhibits, and that was the exhibit that Lieutenant

5  Wetzel referred to numbers of ShotSpotter gunshots

6  that were reported.  Those numbers differ from what

7  Ellefritz knew.

8          THE COURT:  I think for today's purposes --

9  I think the background was laid there to explain

10 shots fired, but for today's purposes, I understand

11 it.  I'm going to decide this based upon what

12 Ellefritz said, had available to him; correct?

13         MR. ALVARADO:  Correct.

14         THE COURT:  Mr. Hanna, do you agree with

15 that?

16         MR. HANNA:  Yes, Your Honor.

17         MR. ALVARADO:  And, if anything, all it

18 points out is that ShotSpotter's recorded number of

19 shots, according to them, differed from what they

20 told Ellefritz.

21         THE COURT:  Understood.  You may step down.

22         Any further witnesses from the government?

23         MR. HANNA:  No, Your Honor.

24         THE COURT:  Any witnesses from the defense?

25         MR. ALVARADO:  No, Judge.

1           THE COURT:  Do you want to make argument?

2           MR. HANNA:  Yes, Your Honor.

3           Your Honor, whether reasonable suspicion

4 exists is a very fact specific analysis.  The legal

5 principals were set forth in the Government's

6 Response and the Defendant's Reply or Memorandum of

7 Law.  We cite another case that kind of sets forth

8 the basic legal principals.  That is the *Drake* case,

9 *Hicks*, *Burgess,* and *Wooden*.

10           There is one particular case that I would

11 like to draw the Court's attention to which is

12 *Burgess*, a Seventh Circuit case, *United States v.*

13 *Burgess* from 2009.  As far as analogy to the facts,

14 I think that one is pretty close.  There is going to

15 be some distinguishing factors, but, again, it is an

16 individual basis.  That case is 561 F.3d 676.

17           That is a situation where there was a

18 2:30 a.m. dispatch to a fight in an apartment

19 complex.  That complex was known for criminal

20 activity.  The officer, in a different scenario than

21 this, heard the gunfire from some location.  The

22 opinion states that within minutes he was told by

23 dispatch that shots had been fired.  That's a quote

24 from the opinion.  He observed only one vehicle, the

25 officer, which was an SUV leaving on the road,

1   meaning the only entry or exit point from the

2   apartment complex.  He did not stop the vehicle.  He

3   actually radioed to other officers and said, I just

4   saw an SUV leaving the only exit and entry point of

5   this area known for criminal activity where shots

6   are fired at 2:30 in the morning, and the other

7   officers stopped the vehicle.

8          The final result of that case in the opinion

9   stated when the Court considers the dangerousness of

10  the crime, the brevity of the interval between the

11  firing of the shots and the spotting of the sole

12  vehicle quickly exiting, the minimal intrusion on

13  the occupants of the vehicle, the need for the

14  police to inform themselves on the conditions of the

15  complex before endangering themselves and entering

16  into that scenario where a shooting is taking place,

17  and the further need to stop potentially fleeing

18  suspects until more information about the crime

19  could be obtained.

20          The Seventh Circuit concluded that the

21  police acted reasonably, which is the touchstone the

22  Fourth Amendment, are the actions of the police

23  under these particular facts reasonable.  It's an

24  objective standard.

25          The government's position, clearly from our

response, is that the officer in this case just, as

in the *Brewer* case, was acting objectively

reasonable in stopping a vehicle under the

circumstances that he did in this case, which are

reliable information from multiple sources, a

ShotSpotter alert system, 911, multiple incidents of

gunshots from an area that the officer is familiar

with from his work in this both District 10 and 11

for a number of years.  He has been called to that

area before.  He is called to a specific residential

address, 2203 North Ellis Street.  He knows that it

is a residential area.

It is a dangerous situation of gunfire.

While he is en route, he receives notice of a second

shooting incident.  It is -- I think Officer

Ellefritz testified on cross, when I believe

Mr. Alvarado was asking him, that this happened

around 4:30 a.m. in the morning.  If you look at the

records in general, they are not that far off of

each other, whether it be a CAD or an AVL MapForce

or the other records that we've submitted as

evidence today; it would be clear that it was more

around 4:40, in the sense that it matters to any

weight, not really all that significant.

But around 4:40 a.m. when there are no other

cars on the street, at least on Ellis Street, he
approaches with his lights off.  And as soon as he
sees a vehicle with its headlights on coming in any
direction, it is the only vehicle that is traveling
on that street.  There is no alley from there.  He
knows that it is a dead end.  And within six to
seven houses of where this shooting, two shootings
have taken place, he is aware at that point in time.
He turns his overhead light on.  There is no
question that there was -- the occupants of that
vehicle were being detained.  The vehicle pulls up
almost to the upper front bumper of the vehicle and
then starts to back away.  He gets out of the
vehicle.  Tells them to stop.  It rolls back a
couple feet.

          What is evident from the video is that as
soon as he stops the vehicle, their arms come out
the window and they are waving around and shouting,
"it happened down there, it happened down there."
So whether the officer is responding for purposes of
the belief that there is a suspect in this vehicle
or there is someone potentially who has suffered a
gunshot wound or a victim or has just knowledge
about what has happened, these people who are in the
vehicle, who have not committed an Illinois Vehicle

1 Code violation, they clearly have information about
2 the shooting almost contemporaneously with the stop.
3       Under those circumstances, it is not
4 unreasonable for the officer to even take the
5 position that anyone leaving that street at that
6 time in the morning under those circumstances can be
7 detained for a very short period of time just to
8 ask, did you see anything, before I go driving my
9 patrol car into an area where there have been
10 multiple gunshots and people fleeing.  So he knows,
11 of course, the people who have left on foot.  He
12 knows that there are people who have gone down other
13 streets.  But as he is driving down McClure and
14 driving down Ellis, he doesn't see anyone on foot.
15 He doesn't see anyone driving on these other
16 streets.  He is focusing on the exact location of
17 the shooting.  And when he starts to proceed in that
18 area there is only one focus and that is the vehicle
19 that is leaving the scene within three and a half
20 minutes of the shooting taking place.
21       So the government's position on a touchstone
22 of reasonableness is that any officer approaching
23 that scene reasonably could have stopped that
24 vehicle to ask some questions.  And as it turns out,
25 Mr. Rickmon has been shot.  It is exactly confirmed.

I suppose that's not in for consideration at this
point.  But he in fact was right, this person in
this vehicle had been shot like two times, and a
firearm was located under the seat, which of course,
the defendant wishes to suppress, but the
government's position is that under all of those
totality of circumstances, the officer's actions are
reasonable and the defendant's Motion to Suppress
should be denied.

Thank you, Your Honor.

THE COURT:  Mr. Alvarado.

MR. ALVARADO:  Well, Your Honor, first of
all, the fact that Officer Ellefritz happened to be
right that somebody was --

THE COURT:  Assume he was wrong, what then
and nobody -- Mr. Rickmon wasn't shot, nothing, and
they said, we know people are back there, that's
where they are, that's why they were waving, but we
don't know anything more then what.  So what was the
stop -- was it wrong then for him to make that stop?

MR. ALVARADO:  Yes, it was.  And you should
not consider anything after the time when the car
was stopped and he had it seized, because that is
the point that you have to judge whether reasonable
suspicion existed for the stop.

1       THE COURT:  So what -- you tell me what he

2  should have done, the officer.  Just tell me.  Under

3  your theory, he should have just let the car go?

4       MR. ALVARADO:  He should have -- what he

5  should have done, once people -- once he saw that

6  there were people congregated down at the site of

7  the gunshots, and that these people were telling him

8  that's where the gunshots were coming from, he

9  should have done what the officer did in *Brewer*

10 originally; that officer was sitting outside the

11 apartment complex on the only road leading to and

12 from it, and he heard a call of gunshots.  He went

13 to the site of the gunshots and let the car go past

14 that he saw.

15      And if you take a look at those facts,

16 that's exactly what occurred.  It was another set of

17 officers who stopped the car in *Brewer* while the

18 first --

19      THE COURT:  *Burgess*.  *Burgess* or *Brewer*?

20      MR. ALVARADO:  *Brewer*.

21      THE COURT:  Okay.  You are referring to the

22 case Mr. Hanna cited?  All right.  I got you.

23      MR. ALVARADO:  Okay.  So he should have let

24 the car -- what he should have done was go to the

25 scene of where the gunshots were occurring because

Officer Ellefritz knew that three and a half minutes
had gone by from the time he got the call that cars
were already northbound on McClure and a black male
had already left on foot, and Officer Ellefritz
testified in cross-examination that because Ellis
Street is such a short street, 276 feet from 2203 to
2222, that the calls that he got from his dispatcher
indicating cars leaving, they would not be there
anymore.

THE COURT:  Under your theory, are you
saying that Ellefritz should have gone to the scene,
let the car pass, and told another officer to stop
the car that Rickmon was in?

MR. ALVARADO:  That's exactly what happened
in --

THE COURT:  What changes?  The other police
car doesn't know anything more about it than
Ellefritz under your theory?  Why does that create a
reasonable suspicion to stop the car?

MR. ALVARADO:  Number one, it's really not
the defendant's burden to show what Office Ellefritz
should have done.  It is merely to point out to the
court what he did in fact do and what information he
had at his disposal at the time he did it.

THE COURT:  Okay.

1          MR. ALVARADO:  And what I'm saying is that
2    at the time he stopped that car, he had no good
3    reason to believe that it was one of the cars that
4    the dispatcher had indicated was already northbound
5    on McClure.  Or even if he took a wild assumption
6    that the cars were starting out from 2203 Ellis,
7    three and a half minutes went by, and because he was
8    familiar with Ellis, he knew that those cars would
9    not be on Ellis.  So, he is thinking, that this car
10   had to be a different car, that that is not related
11   to the 911 call that he had received and he was
12   stopping it, whether it contained a shooter, a
13   victim, a witness, or just an innocent bystander.
14   He had no idea.  And he said that he was going to
15   stop any four of those categories based on what he
16   heard but that is confusing and makes no sense, no
17   common sense at all when the only information he had
18   about vehicles didn't include a make or a model or a
19   color or number of occupants, a description of the
20   occupants, whether or not anyone in the car had
21   guns, or had been shot, or was apart of the incident
22   at all.  He had none of that knowledge at the time
23   that he stopped the car that Mr. Rickmon was riding
24   in.  That is why that differs from the cases that
25   the government cites.  Because if you look at the

facts of those cases, they very clearly indicate
that the officers that made those stops in every one
those cases: *Wooden*, *Hicks*, even *Brewer*, *Burgess*,
and I think those are the main cases cited by the
government in its response.  In each of those cases,
they had a clear description of either the vehicle
or the person who the officer was directed to
respond to, but that's not the case here.

THE COURT:  Okay.

MR. ALVARADO:  Now, the -- we know from the
case -- we know the law that an officer who is going
to make a stop based on reasonable suspicion has to
have some particularized information at his hands
when he makes that decision.  It can't be based on a
hunch.  It can't be based on just some confused or
inchoate idea that maybe this is the car or this
subject is connected to this incident.  He has to
have more than that.

Now the government says -- and it says in
its response, that there is somehow an emergency
exception to a reasonable suspicion requirement,
that because it's a dangerous situation, that
somehow that lessens the quantum of evidence that an
officer would have to have to reasonably suspect a
car and stop it.  Well, that's -- to the extent that

the government is saying that, that's just not
constitutional law.  There is no difference in the
amount of reasonable suspicion that is needed to
make a stop that conforms with the Fourth Amendment.
We can't just stop cars because of different sets of
standards.

I mean, if this were a 911 call of a
burglary to an auto, you don't have one set of
requirements of reasonable suspicion.  But if it's a
call to a murder, oh, well, that's different, then
he doesn't need that much -- that much reasonable
suspicion.  No, it's the same standard for any sort
of call.

The cases the government cites:  *Wooden*, and
*Hicks*, and *Burgess*.  He cited those cases because
they stand for the proposition that when there is an
anonymous 911 call, that there is no need for a
police officer to independently verify any of the
information in that call before he acts.  That's why
those cases say that when he gets that call, if it's
a dangerous or emergency situation, then he can
operate based on that, but that does not eliminate
the requirement that he still have reasonable
suspicion for the stop.  And that's not what Officer
Ellefritz did in this case.  And we know that.

1      THE COURT:  Okay.

2      MR. ALVARADO:  I appreciate the Court's

3  concern about what was he supposed to do, but we

4  cannot let him stop cars even if he suspects that

5  there is a victim or a witness in a car just because

6  he is trying to investigate a possible crime

7  because --

8      THE COURT:  I didn't mean it to mean that

9  without -- I meant -- I understand that there is

10 this -- he needs to have a reasonable suspicion.  I

11 was responding to -- I thought that you were just

12 saying that he shouldn't have stopped the car; he

13 should have let the next officer stop the car.  And

14 I was saying what difference -- I mean under your

15 theory, if he doesn't have any reason suspicion to

16 stop the car, how could he tell the next officer to

17 do so, but that's not what you're saying.

18     MR. ALVARADO:  No, it's not.

19     THE COURT:  I thought that's what you were

20 saying under the other case cited by Mr. Hanna.

21     Go ahead.

22     MR. ALVARADO:  Right.  And the Court can

23 look at the government's cases and they can see that

24 there were fact patterns similar to that where the

25 first set of officers let a car go by and a

1  different set of officers actually made a stop.  But

2  it's not up to the defense to determine what Officer

3  Ellefritz should have done.  It should be only our

4  obligation to ask what did he know at the time and

5  did it amount to --

6          THE COURT:  I understand what you're saying,

7  your position is based on what he knew he should

8  have let the car go.

9          MR. ALVARADO:  Exactly.

10          THE COURT:  And that would have been the end

11  as it pertained to the car Mr. Rickmon was in.

12          MR. ALVARADO:  Exactly.  And the Court

13  should not take a look -- should not be using the

14  dispatcher log information itself what is listed as

15  to what the dispatcher wrote down in notes because

16  Officer Ellefritz didn't know about that, and it

17  shouldn't use the number of ShotSpotter gunshots

18  that it was reporting as some evidence of reasonable

19  suspicion because Officer Ellefritz only knew about

20  two shots, then two shots.

21          THE COURT:  And you're not prepared today to

22  make any argument as to under your theory what else

23  he needed to know before he could stop the car.

24  You're just saying that based upon -- your position

25  what he knew, he had no reasonable suspicion to stop

1 the car and he should let it go.

2 MR. ALVARADO: Right. I don't think that I

3 should have to speculate as to what would have

4 constituted reasonable suspicion. It is merely my

5 burden to show that he didn't have reasonable

6 suspicion under these facts.

7 THE COURT: Understood. Anything else,

8 Mr. Hanna?

9 MR. HANNA: No, Your Honor.

10 Actually, yes. Mr. Alvarado has said the

11 vehicle was stopped just because he was leaving this

12 area. That is not true. I mean he stops the

13 vehicle because it is, again, 4:40 in the morning

14 and six houses down from where a shooting happened

15 three and a half minutes ago; it's the only vehicle

16 leaving a dead end street; that's why the vehicle

17 was stopped. So it's not just "because."

18 And I think with regard to the *Brewer* case,

19 to be clear that's the one that I was saying was

20 factually analogous. There was no independent 911

21 call or a person to describe that vehicle. It is

22 the same circumstances. The officer saw that

23 vehicle and he let it go by and then radioed to stop

24 that SUV. So there is really no difference here

25 except for the officer in this case, in *Brewer*,

would have stopped the vehicle.  The Court would
logically found have that there was reasonable
suspicion to stop that vehicle, too.

The government's position is that there was
more than adequate suspicion to stop the vehicle.

THE COURT:  Mr. Alvarado, go ahead.

MR. ALVARADO:  Your Honor, if I could
briefly respond.  That is the case that I was
talking about, *Brewer*.  And if the Court is at all
getting the facts confused about that --

THE COURT:  I'm not.

MR. ALVARADO:  But what Mr. Hanna said was
not quite accurate either.

The officer, the first officer in *Brewer*
went to the scene of the gunshots.  Let the car go
by, and then a different set of officers stopped the
car without getting a message from the first officer
to stop it or anybody.  All the first officer said
was a white car is going past, keep an eye on it,
something to that effect.

The second set of officers took it upon
themselves to stop it, but I started raising those
facts when the Court asked me, "Well, what should
Ellefritz have done?"  And that was the first thing
that came to my mind is what they did in a different

1  case.  And it still in my opinion is distinguishable

2  from these facts because in that case they at least

3  had more evidence of just one car fleeing a scene of

4  gunshots.  Here Ellefritz had a message, information

5  that multiple cars were leaving, but they were

6  already northbound on McClure.  And he didn't do

7  anything to try to clarify that in his mind before

8  he stopped the car that Mr. Rickmon was in.

9       THE COURT:  All right.  We are approaching

10 the holidays.  I will have an order in this matter

11 probably at some point next week.

12       For the purpose of the trial, which is set

13 for January 22nd, I think that we should set another

14 -- depending on how the ruling -- but I think that

15 we should look at maybe January 10th -- is that a

16 Thursday?  -- for a pretrial, and I will have an

17 order entered before then, and then we will address

18 where we are on January 10th.

19       Does that work for both of you?  That's a

20 Thursday.  What do we have at 9:30 in the morning?

21 I assume both of you are here that day anyway.

22       MR. HANNA:  Yes, Your Honor.

23       MR. ALVARADO:  Yes, Judge.  That's good.

24       THE COURT:  January 10th, 2019, at 9:30 a.m.

25 for pretrial.

```
 1          Okay.  So we will leave the trial date in
 2   place at this point.
 3          MR. ALVARADO:  I'm sorry?
 4          THE COURT:  We will leave the trial date in
 5   place at this point.
 6          MR. ALVARADO:  That's fine.
 7          THE COURT:  Okay.  Thank you.
 8          MR. HANNA:  Thank you, Your Honor.
 9          (Which were all of the proceedings held on
10          this day.)
11                              ****
12
13       I certify that the foregoing is a correct
14   transcript from the record of proceedings in the
15   above-entitled matter.
16
17
18   s/Nancy Mersot          Date: May 9, 2019
19   Court Reporter
20
21
22
23
24
25
```